Florence KAHN, Respondent,

v.

STATE of Minnesota, University of Minnesota, (self-insured), Relator,

Travelers Insurance Company, Intervenor, Respondent,

Blue Cross and Blue Shield of Minnesota-Minnesota Indemnity, Inc., Intervenor, Respondent.

No. 49103.

Supreme Court of Minnesota.

Jan. 25, 1980.

Rehearing Denied March 11, 1980.

---

Jeffrey B. Nelson, St. Paul, for relator.

Peterson, Peterson & Engberg and Thomas W. Wexler, Minneapolis, for Kahn.

Indrus S. Advani, St. Paul, for Blue Cross-Blue Shield of Minnesota/Minnesota Indemnity, Inc.

R. V. Illgen, Minneapolis, for Travelers Ins.

VanEvera Mundt, Koskinen, Clure & Andrew and Thomas F. Andrew, Duluth, for Minnesota Assn. of Commerce and Industry.

Heard before OTIS, PETERSON, and SCOTT, JJ., and considered and decided by the court en banc.

WAHL, Justice.

Certiorari to review a decision of the Workers' Compensation Court of Appeals awarding compensation upon the finding that respondent, Florence Kahn, was an employee of relator, University of Minnesota; that the automobile accident that rendered her quadriplegic arose out of and in the course of her employment; and that the employer had actual knowledge of the occurrence of the injury and of the employee's claim of causal relationship as required by the Workers' Compensation Law of Minnesota. We affirm.

In the spring of 1973, Dr. Ida Martinson, an assistant professor and director of research at the University of Minnesota School of Nursing, asked respondent, previously a head nurse at the University Hospitals, if she would be interested in assisting her in developing a proposal to be presented to Blue Cross and Blue Shield of Minnesota for the purpose of obtaining a research grant to study the home care of children terminally ill with cancer. From Dr. Martinson's point of view, respondent was an ideal person for the job because her previous experience as a pediatric nurse who had worked with leukemic children at the University Hospital had given her a familiarity with the hospital complex, medical terminology, and, in particular, the hospital charts.

Respondent agreed to write the proposal. No written contract was entered, but it was understood that respondent would receive $9 or $10 per hour, to be paid in a lump sum upon completion of the project. It was further agreed that respondent, who was about six months pregnant at the time and had previously suffered a miscarriage, could work on the project at her home as much as possible in order to minimize the strain on her health, as well as to avoid parking problems commonly encountered at the University and to provide a quieter environment for concentrated work.

Respondent began her work in early May by reading the necessary background material at home. She then spent time researching at the University, examining medical and financial charts and reviewing the literature on the subject of home care. In the evenings, at home, she correlated and organized the data she had obtained during her research each day and began writing the proposal. The last week in May, respondent drafted the proposal at her home. About June 4, respondent gave Dr. Martinson the typed proposal. It was understood that respondent would participate in the presentation to Blue Cross on June 14, since her research would form its basis.

On June 6, respondent informed Dr. Martinson that she wanted to try to find addi-

tional financial data to add to the proposal in order to better support their presentation to Blue Cross. After the June 6 meeting, respondent updated the version of the proposal she had given to Martinson on June 4 by condensing some of the figures, adding to the bibliography, and rewriting the "significance" section of the report.

On June 8, 1973, after running various errands and attending a voice lesson, respondent drove to the University to look for certain financial charts, unavailable earlier, to add to the final draft of her proposal. Respondent arrived at the University at about 12:30; her search for additional financial data was unsuccessful. She then brought the final draft of the proposal to one of the secretaries at the School of Nursing for typing and left the University to drive home at about 1:30 or 2:30 p. m.

Respondent planned to review the research she had done on the proposal that evening at home, in order to prepare for the presentation. She had become quite involved in the project, was disappointed at her inability to find more financial charts to support the proposal, and was so preoccupied with her plans for the presentation that she missed her exit from Highway 12 on her way home. She then proceeded to take an alternate route. When stopped at the semaphore at Highway 55 and Boone Avenue, shortly after 3:00 p. m., respondent's car was struck from behind by an uninsured motorist. As a result of the accident, respondent's spinal cord was injured, leaving her paralyzed from the neck down.

During the first approximately 12 days following her accident, respondent was coherent and could communicate.[1] Her primary concerns, however, were medical treatment and care and the survival of herself and her unborn baby. She did not discuss with her husband, Dr. Alan Kahn, where she was coming from when the accident occurred.

Respondent soon began to experience respiratory problems, which were aggravated by her advanced pregnancy. On June 14, respondent was transferred from North Memorial Hospital to the University Hospital, and on June 20, an anterior cervical fusion was performed in order to stabilize the cervical fracture.

After surgery, respondent's respiratory condition continued to worsen. She developed pneumonia and was transferred to intensive care, where she was able to breathe only with the aid of a respirator. In the approximately five months following her surgery, respondent's condition so deteriorated that her doctors suggested to her husband that the respirator be turned off. Her husband refused, and assisted in her care himself. During this entire time, until January 1974, respondent was unable to speak at all.

Respondent's respiratory condition gradually improved, and she was transferred to the rehabilitation section of the hospital. A special tube was inserted in her throat to enable her to talk, although still with great difficulty, in January 1974. It was at this time that respondent mentioned to her husband for the first time that she had been working at the University on the day of the accident.

Shortly thereafter, when discussing possible sources of financial assistance for respondent, Dr. Kahn passed this information on to Albert Dorn, a social worker employed by the University's Department of Physical Medicine and Rehabilitation. Dr. Kahn told Dorn that respondent had been working on a proposal at the University, had dropped it off, and was on her way home when the accident occurred. Dr. Kahn testified that he discussed the possibility of obtaining workers' compensation with Dorn and was told that it was out of the question. Dr. Kahn relied on this information and did not

---

1. Realizing that she would be unable to attend the Blue Cross presentation the following week, respondent asked her husband to tell Dr. Martinson about the accident. Dr. Kahn telephoned Dr. Martinson about June 10, 1973, and informed her of respondent's injury. Dr. Martinson testified that Dr. Kahn told her that respondent had been shopping at the time of the accident. Dr. Kahn, however, denied having said this testifying that he had no knowledge of respondent's activities on June 8.

pursue the matter of workers' compensation further at that time.

In about January 1975, Dr. Kahn called August Gehrke, the Assistant Commissioner of Education for Vocational Rehabilitation, to discuss rehabilitation opportunities for respondent. In the course of their conversation, Gehrke suggested that the advice given by the social workers at the University might be wrong and that Dr. Kahn should contact the Workers' Compensation Division.

Following the conversation with Gehrke, Dr. Kahn did obtain information from the Workers' Compensation Division. An official notice of respondent's workers' compensation claim was filed with the state in January 1975. Respondent filed a claim petition May 20, 1975.

After a three-day hearing in November 1975, the compensation judge determined that respondent was an employee of the University, not an independent contractor, and that she sustained her injury in the course of her employment. Compensation was nevertheless denied, because the compensation judge found that the University did not have actual knowledge or notice within 90 days of the accident, as required by Minn.Stat. § 176.141 (1971).

In June 1978, after taking more evidence on the issue of notice, the Court of Appeals affirmed the decision of the compensation judge with respect to the existence of an employment relationship and its causal connection with the accident. The court determined, however, that the period within which notice of claim must be given is extended by operation of law for 90 days from the date the employee had the physical and mental capacity to give notice. The court found that respondent was unable to communicate, and therefore was physically and mentally incapable of giving notice, before January 11, 1974. It further found that the University had actual knowledge of the injury about June 10, 1973, and notice of the claim of causal relationship

about January 11, 1974. Shortly after the original decision was issued, the Court of Appeals amended its findings to state that respondent was not able until January 1975 to communicate sufficient facts about her injury to ascertain whether or not her injury was causally related to her employment, and that the University had notice in January 1975.[2] Compensation was awarded.

This appeal raises three issues: (1) Was respondent an employee of the University? (2) Did the injury arise out of and in the course of her employment? (3) Did the University have actual knowledge or notice of the injury within 90 days of its occurrence, as required by statute?

1. Initially, we must consider the question of whether respondent was an employee of the University at the time she was injured. The compensation judge found that respondent was hired by the University as a consultant for a specific research project, which would have been completed with her attendance at the presentation to Blue Cross on June 14, 1973. The judge concluded that she was a casual employee on June 8, hired in the usual course of the University's business, and therefore was entitled to workers' compensation coverage. *Farnam v. Linden Hills Congregational Church,* 276 Minn. 84, 149 N.W.2d 689 (1967). This determination, which is well supported by the record, was affirmed by the Court of Appeals.

■ In analyzing whether respondent was an independent contractor or an employee of the University, the factors set forth in *Guhlke v. Roberts Truck Lines,* 268 Minn. 141, 128 N.W.2d 324 (1964), must be considered: "(1) The right to control the means and manner of performance; (2) the mode of payment; (3) the furnishing of material or tools; (4) the control of the premises where the work is done; and (5) the right of the employer to discharge." 268 Minn. 141, 143, 128 N.W.2d 324, 326 (1964) (footnote omitted). *See also Wangen*

---

2. There is no support in the record for changing the date of respondent's ability to communicate.

*v. City of Fountain,* 255 N.W.2d 813 (Minn. 1977).

■ With regard to factor (1), right to control performance, the record leaves little doubt that Dr. Martinson retained the right to control the means and manner of respondent's work on the proposal. Dr. Martinson fully informed respondent of the substance of the project, and then directed her to gather data relative to the length and cost of final hospitalization of leukemic children from the hospital's medical and business charts and to review the latest literature on the subject to ensure that the project being proposed had not already been undertaken somewhere else. She provided respondent with a similar proposal to serve as an outline, since respondent had never before developed a grant proposal. In addition, Dr. Martinson's co-author furnished respondent with a list of the cases to be included in the proposal. Dr. Martinson made suggestions and corrections to the draft prepared by respondent and testified that she would have given further direction if she had felt respondent needed it. It was Dr. Martinson who was ultimately responsible for the project proposal and who determined its content and scope.

Factor (3), the furnishing of materials or tools, again indicates the existence of an employment relationship. Background reading materials, the sample grant proposal, and the list of cases to be studied were furnished by Dr. Martinson and Dr. Kersey. The medical and business charts relied on to supply the basis of the proposal were the property of the University. In addition, the literature reviewed by respondent was part of one of the University's libraries. Respondent herself supplied only her own paper, pencils, and typewriter. Moreover, the final draft of the proposal was typed by a secretary at the School of Nursing.

Factor (4), the control of the premises where the work is done, also supports the determination that respondent was not an independent contractor. All of respondent's review of medical and business records was necessarily performed on the University campus. And, as mentioned above, respondent carried out research in one of the University libraries. Dr. Martinson also had arranged for a desk at which respondent could work, but then approved respondent's request to work at home when possible.

Factor (5), the right of the employer to discharge, indicates that respondent was an employee of the University. Respondent would have been discharged if her work had been unsatisfactory or if the dollar limit on the project had been exceeded before the work was near completion.

Factor (2), the mode of payment, provides less support for the determination that respondent was an employee of the University, since she was paid on an hourly basis for time actually expended on the project. She was paid in a lump sum, and no taxes were withheld. However, the absence of withholding for taxes or Social Security need not be a controlling factor, *see Hammes v. Suk,* 291 Minn. 233, 236, 190 N.W.2d 478, 481 (1971). The record here adequately supports the finding that respondent was a casual employee of the University at the time of her injury.

■ 2. We next consider the question whether her injuries arise out of and in the course of that employment. As a general rule, personal injuries suffered by an employee while traveling between his home and his work premises do not fall within the coverage of workers' compensation. Minn. Stat. § 176.011, subd. 16 (1971); *see Lundgaard v. Dept. of Public Safety,* 306 Minn. 421, 237 N.W.2d 617 (1975). An exception is made, however, for the employee who is traveling between two portions of his work premises. *See* 1 A. Larson, *Workmen's Compensation Law,* § 15.14 (1978); *see, e. g., Waalk v. Tonkawood Construction Co.,* 305 Minn. 44, 232 N.W.2d 19 (1975). Thus, if a portion of the employee's work is performed at home, situations arise in which an injury that occurs during the trip between the employee's home and his employer's premises may fall within the scope of workers' compensation coverage. 1 A. Larson, *supra,* § 18.30–.34.

In two categories of cases, injuries suffered during travel between the employee's home and another portion of the employment premises are covered by workers' compensation:

In some cases, the establishment of the home as a business situs can best be undertaken by demonstrating a clear business use of the home at the end of the specific journey during which the accident occurred. In others, there may be no evidence that on that particular night the claimant was going to perform some particular work; in these cases the evidence must take the form of proof that the regularity of work at home and other factors endow the home with the continuing status of a work place, so that any going and coming journey is covered.

*Id.* at § 18.31. The compensation judge found, and the court of appeals affirmed, that respondent's home had the continuing status of a work place and that respondent intended to work on the project after returning home from the University on June 8.

■ The record amply supports the determination that respondent's home was regularly used as a work situs. As Larson explains:

When reliance is placed upon the status of the home as a place of employment generally, instead of or in addition to the existence of a specific work assignment at the end of the particular homeward trip, three principal *indicia* may be looked for: the quantity and regularity of work performed at home; the continuing presence of work equipment at home; and special circumstances of the particular employment that make it necessary and not merely personally convenient to work at home.

1 A. Larson, *supra*, § 18.32. In the instant matter, all three of these conditions are met. First, respondent had spent considerable time reading background materials at home; she had organized and correlated hospital cost figures at home; and she had written the proposal itself at home. Second, her background materials were at home, as were the results of the research she had performed. It was this information that respondent planned to review on the evening of June 8. Third, although respondent did prefer to work at home in order to avoid the inconvenience of parking problems at the University, it was also desirable for her to work at home for health reasons because of her advanced pregnancy and previous miscarriage. Furthermore, her home provided respondent with a quieter setting in which to study and to write the proposal.

■ The record also adequately supports the factual determination that respondent intended to work on the project after returning home on June 8. She had spent evenings at home reworking the final draft of the proposal between June 6 and June 8. Even after she had completed the written proposal, respondent was still concerned with, and actively preparing for, the presentation to Blue Cross, which was to take place the following week. While it is true that several days remained in which respondent might have completed her preparation for the presentation, she testified that her plan was to tie up loose ends before the weekend. Because all of respondent's notes and research materials were already at her home, she cannot be expected to have been carrying materials with her at the time of the accident in order to prove her intent to work upon returning home.

■ Our scope of review on factual issues such as this is limited; we may reverse only if the evidence and permissible inferences clearly require reasonable minds to adopt a contrary conclusion. *Saholt v. Northwest Airlines, Inc.,* 290 Minn. 393, 398–99, 188 N.W.2d 772, 775–76 (1971). The compensation judge, who heard all of the testimony and read all of the depositions, found the evidence to show that respondent's participation in the project would not have been completed until after the presentation to Blue Cross had taken place and that respondent intended to work on the project after she arrived home from the University on June 8. The Court of Appeals agreed and adopted the compensation judge's finding

that respondent's injury arose in the course of her employment with the University. On this record, under the facts unique to respondent's particular situation, we cannot say that a contrary conclusion is required.

3. The final issue for our determination is that of notice. Under the statute in effect at the time of the injury, unless the employer had either written notice or actual knowledge of the injury for which compensation is sought within 90 days of the occurrence of that injury, compensation cannot be allowed. Minn.Stat. § 176.141 (1971).[3] The compensation judge concluded that the University did not have actual knowledge or notice of the injury within the meaning of the statute.

The Court of Appeals reversed the compensation judge on the issue of notice. The court held, unanimously on this issue, that the provisions relative to notice cannot apply during the period employee was physically and mentally incapable of performing the act(s) necessary to give notice. The court gave employee 90 days from the date such disability ceased in which to give notice. The court found that respondent was unable to communicate, and therefore was physically and mentally incapable of giving notice, before January 11, 1974. It also found that the University had actual knowledge of the injury about June 10, 1973, and notice of the claim of causal relationship about January 11, 1974.

Although the statute is, as the compensation judge noted, devoid of any language permitting such an extension, there is good reason to extend the period within which notice of claim must be given where an employee is mentally or physically unable to give notice. Minn.Stat. § 176.151(6) (1971), provides that, in case of physical or mental incapacity, the period of limitation within which a workers' compensation action may be brought is extended for two years beyond the date when the incapacity ceases. Given this legislative decision to extend the statute of limitations in cases of incapacity, it would be incongruous to bar the claim of a mentally or physically incapacitated employee for failure to file notice of claim within 90 days of the injury.

As this court stated in *Kaljuste v. Hennepin County Sanatorium Commission,* 240 Minn. 407, 61 N.W.2d 757 (1953): "Statutes relating to the same subject are presumed to be imbued with the same spirit and to have been passed with deliberation and full knowledge of all existing legislation on the subject and regarded by the lawmakers as being parts of a connected whole." 240 Minn. at 414, 61 N.W.2d at 762. In the same vein, we stated in *Fink v. Cold Spring Granite Co.,* 262 Minn. 393, 115 N.W.2d 22 (1962), that:

* * * [T]he Workmen's Compensation Act is a remedial statute and must be liberally construed to effectuate its purpose. While it is true that if the meaning of a statute is plain there is ordinarily no room for construction, it is equally true that the legislature should not be taken to intend absurd or contradictory consequences.

3. Minn.Stat. § 176.141 (1971) provided as follows:

> NOTICE OF INJURY. Unless the employer has actual knowledge of the occurrence of the injury or unless the injured worker, or a dependent or some one in behalf of either, gives written notice thereof to the employer within 14 days after the occurrence of the injury, then no compensation shall be due until such notice is given or knowledge obtained. If the notice is given or the knowledge obtained within 30 days from the occurrence of the injury, no want, failure, or inaccuracy of a notice shall be a bar to obtaining compensation unless the employer shows that he was prejudiced by such want, defect, or inaccuracy, and then only to the extent of such prejudice. If the notice is given or the knowledge obtained within 90 days, and if the employe or other beneficiary shows that his failure to give prior notice was due to his mistake, inadvertence, ignorance of fact or law, or inability, or to the fraud, misrepresentation, or deceit of the employer or his agent, then compensation may be allowed, unless the employer shows that he was prejudiced by failure to receive such notice, in which case the amount of compensation shall be reduced by such sum as fairly represents the prejudice shown. Unless knowledge is obtained or written notice given within 90 days after the occurrence of the injury no compensation shall be allowed.

262 Minn. at 405–06, 115 N.W.2d at 30–31. We therefore read into the notice provision, Minn.Stat. § 176.141 (1971), an extension of the period in which notice of claim must be given in case of physical or mental incapacity for 90 days beyond the date when the incapacity ceases, in order to achieve consistency with the extension provided by the statute of limitations. Not to do so has raised constitutional questions in other jurisdictions. *See Harryman v. Hayles*, 257 N.W.2d 631 (Iowa 1977), which held that a notice of claim statute which allows extension of the notice period for a maximum of 90 days for incapacity denies equal protection of the laws to a class of more severely injured claimants.

■ It is undisputed that Mrs. Kahn was unable to communicate sufficient facts about her injury before January 11, 1974, to delineate causal relationship between her injury and her employment. It is also undisputed that official notice of her workers' compensation claim was not filed until January 1975. The Court of Appeals found that the employer had actual knowledge of the occurrence of respondent's injury on or about June 10, 1973, and that respondent's claim of causal relationship of the injury to employment was made to the employer on or about January 11, 1974. Amended findings changed the date of the respondent's ability to communicate and notice of the claim to January 1975. The record supports the change of date as to actual notice but not as to the date of Mrs. Kahn's ability to communicate. We will not, however, reverse on appeal a correct decision simply because it is based on incorrect reasons. *Schoeb v. Cowles*, 279 Minn. 331, 336, 156 N.W.2d 895, 898 (1968); *Cambern v. Hubbling*, 307 Minn. 168, 171, 238 N.W.2d 622, 624 (1976). While the record may be unclear as to whether the decision was founded on a mistake of fact or a finding that respondent's inability to give notice continued beyond January 11, 1974, we find the University estopped from raising the issue of the time of formal notice of the claim. There is ample evidence in the record, including a finding of the compensation judge, that in January 1974, after respon-

dent had regained her voice and told her husband, Dr. Alan Kahn, of her activities on the day of the accident, Dr. Kahn was told by an agent of the University that respondent had no compensation claim. Dr. Kahn testified in his deposition and at the hearing that in January of 1974 he spoke with Albert Dorn, a social worker employed by the University in the Department of Physical Medicine and Rehabilitation. He told Dorn the facts of the accident and was told by Dorn that the injury was not compensable because respondent was a part-time employee. Relying on this advice because it came from a member of the University of Minnesota staff, the Kahns did not proceed until January 1975, when Dr. Kahn spoke with August W. Gehrke, the Assistant Commissioner of Education for Vocational Rehabilitation in the State of Minnesota. In his deposition, Gehrke corroborated the testimony of Dr. Kahn. Indeed, the Court of Appeals, assuming that Dr. Kahn's testimony was correct, refused to consider further evidence regarding the conversation, even though Dorn denied discussing workers' compensation with Dr. Kahn.

■ The evidence before us, then, shows that within 90 days of respondent's undisputed incapacity, her husband was dissuaded by Dorn from filing a compensation claim on behalf of his wife until 12 months later, when Gehrke suggested that Dorn might have been wrong. The University's agent having misled Dr. Kahn about his wife's claim, the University is estopped from raising the issue of the time of formal notice. Other jurisdictions have excused late claims for compensation when the employer or his agent misled the claimant into thinking he had no claim. *See Levo v. General-Shea-Morrison*, 128 Mont. 570, 280 P.2d 1086 (1955); *City and County of Denver v. Phillips*, 166 Colo. 312, 443 P.2d 379 (1968). *See also Prager v. Lakeridge Theater*, 483 P.2d 408 (Colo.App.1971). In the instant case, relying on the counsel of a University employee who was responsible for rendering advice regarding financial matters, respondent failed to file a workers' compensation claim for a full year. The

University will not now be permitted to raise this delay, induced by its own agent, to bar respondent's claim.

Affirmed.

OTIS, Justice (dissenting).

Because in my opinion respondent has failed, as a matter of law, to sustain her burden of proving that her injury arose out of and in the course of her employment, and because the University did not receive adequate notice of her claim, I respectfully dissent.

1. The majority concedes it is the settled law of this state, subject only to certain limited exceptions, that personal injuries suffered by an employee while traveling between work premises and home do not fall within the scope of workers' compensation coverage. Minn.Stat. § 176.011, subd. 16 (1978); *Lundgaard v. Department of Pub. Safety*, 306 Minn. 421, 237 N.W.2d 617 (1975). Respondent here attempts to fit within an exception which grants compensation benefits to an employee who is injured while traveling between two areas of work premises, and argues that her home had become one of them. 1 Larson, *The Law of Workmen's Compensation* §§ 15.14, 18.30–.34 (1978) (hereinafter *Larson*). *See, e. g., Waalk v. Tonkawood Constr. Co.*, 305 Minn. 44, 232 N.W.2d 19 (1975). An examination of the record leaves little doubt that respondent does not qualify for such an exception.

The work required of respondent consisted primarily of studying the available literature on the subject of home care for terminally ill children, reviewing the medical and financial charts of children who had been hospitalized for cancer and had died at the University Hospital, and writing a grant proposal by following a sample that had been furnished by Dr. Martinson.

Respondent began her work in early May by reading background material given her by Dr. Martinson at home. She then spent time researching at the University, examining medical and financial charts and reviewing the latest literature on the subject of home care. In the evenings, at home, she correlated and organized the data she had obtained during her research each day. The last week in May she drafted the proposal at her home.

On June 6, 1973, respondent met with Dr. Martinson and others, and they agreed that they were ready to go forward with the presentation to Blue Cross on June 14. It was understood that respondent would assist Dr. Martinson, since her research formed the basis of the presentation, although the exact extent of her planned participation is not clear from the record.

After the June 6 meeting respondent updated the proposal at home by clarifying the chart, adding a bibliography, and condensing certain figures. She also spent time working on the proposal in the evenings with her husband, whose combined experience in medicine and business enabled him to assist her in rewriting a portion of the summary.

On Friday, June 8, 1973, after running various errands and attending a voice lesson, respondent drove to the University to look for certain financial charts to add to the final draft of her proposal. Although her search for additional data was unsuccessful, respondent then brought the final draft of the proposal to one of the secretaries at the School of Nursing for typing. She left the University to drive home at about 1:30 or 2:30 p. m.

Respondent testified that she was quite disappointed by her inability to find additional financial charts, and that she was so preoccupied with that and with her plans for the presentation to be held the following Thursday that she missed her usual exit from Highway Twelve. Then, while stopped at a semaphore on an alternate route home, her automobile was struck from behind.

Respondent testified that she planned to work on the presentation upon returning home on June 8, although she admitted that she would also be preparing supper that evening, and therefore did not know precisely when she would begin her work. She said she intended to review her research

notes, all of which were already at her home, to reacquaint herself with the material to be used in the presentation, some of which had not been included in the written proposal. Respondent testified that she wanted to tie up loose ends before the weekend, because her weekend time was usually spent with her husband.

Before workers' compensation coverage can be extended to cover personal injuries sustained while traveling between home and another work situs, it must be shown that "the work duties associated with the employee's home are such that it can genuinely and not fictitiously be said that the home has become part of the employment premises." 1 *Larson, supra,* § 18.31 at 4–264. Otherwise the general rule of noncoverage would ·be subject to erosion by the claims of all those professionals and semiprofessionals who intend to do some work at home, while leaving uncovered those laborers who are unable to profess such an intent. 1 *Larson, supra,* § 18.32 at 4–270 to 4–272.

There are two categories of cases in which injuries suffered during travel between · the employee's home and another portion of the employment premises are covered by workers' compensation.

In some cases, the establishment of the home as a business situs can best be undertaken by demonstrating a clear business use of the home at the end of the specific journey during which the accident occurred. In others, there may be no evidence that on that particular night the claimant was going to perform some particular work; in these cases the evidence must take the form of proof that the regularity of work at home and other factors endow the home with the continuing status of a work place, so that any going and coming journey is covered. 1 *Larson, supra,* § 18.31 at 4–265.

In the matter now before us; the evidence is entirely too speculative to support a conclusion that respondent was going to begin to work upon returning home on Friday, June 8. There is no evidence to support respondent's claim other than her own statement of intent. She was carrying no materials with her at the time of the accident. Furthermore, she had already turned in the final draft of her proposal for typing, and some five or six days remained in which she could have reviewed her research to prepare for the Blue Cross presentation.

On the facts before us, respondent did not demonstrate a business use of her home at the end of her journey on June 8. Nor is this a case in which the employee was obliged to interrupt work she had already begun at home following which it was necessary to return home again in order to complete her work. Nor does respondent qualify for workers' compensation coverage on the basis that her home had taken on the continuing status of a work situs because her employment involved no special circumstances that made it necessary, rather than merely personally convenient, that she performed work at home. 1 *Larson, supra* § 18.32.

2. Minn.Stat. § 176.141 (1971) requires notice to the employer within ninety days after the occurrence of the injury in order to allow compensation. The statute provides for two forms of notice—either written notice or actual knowledge. The compensation judge denied recovery because respondent did not give notice of the claim from June 8 to September 6, 1973—the ninety-day period after the accident. The court of appeals reversed, holding that the ninety-day reporting period required by the statute did not commence until the date the employee had the physical and mental capacity to make a claim and to give notice thereof. Without passing on the questionable validity of such a holding, the facts of this case do not, in my opinion, permit a finding that written notice was given or that the employer had actual knowledge of the claim even within the extended ninety-day period.

The court of appeals based its decision on two of its Findings of Fact. First, based on additional testimony of respondent's husband, Dr. Kahn, the court found that on January 11, *1974,* respondent was able to tell him that she was engaged in work for

the University at the time of the accident and that she was unable to communicate this information prior to that date. Thus, the extended ninety-day period would have run until mid-April 1974. Second, based on testimony of Dr. Ida Martinson, the court found that she received notice of the worker's compensation claim on or about January 11, *1974*. The court of appeals later amended these findings on motion of respondent's counsel because it believed there was an error in these dates. The amended findings were that both respondent's ability to communicate and the notice of the claim occurred in January *1975*. There is support in Dr. Martinson's testimony at the deposition for changing the date of notice to January 1975. There is no support in the record, however, for changing the date of respondent's ability to communicate. She was in fact able to and did communicate in January *1974*.

The only possible basis for concluding that respondent could not communicate prior to January 1975 relates to respondent's voice operation. However, twelve months prior to that date, respondent had fully informed her husband of her alleged work-related activities. Thus, I cannot find any evidentiary support for the finding that notice was given within ninety days of the time the employee was able to communicate information as to her work activities.

The court of appeals' finding that the employer had actual knowledge of the injury on June 10, 1973, does not change this result. There is no evidence that Dr. Martinson, as agent for the employer, had any knowledge that Florence Kahn had been injured in relation to her work at the University of Minnesota on the day of the accident. Professor Larson states:

> The present tendency is to excuse lack of notice whenever the employer acquired actual knowledge of the accident, no matter how he acquired it. * * * It is not enough, however, that the employer, through his representatives, be aware that claimant "feels sick," or has a headache, or fell down, * * *. There must in addition be some knowledge of accompanying facts connecting the injury or illness with the employment, and indicating to a reasonably conscientious manager that the case might involve a potential compensation claim.

3 *Larson, supra*, § 78.31a at 15–31 to 15–44 (footnotes omitted). Minnesota case law is in agreement with this position. "[M]ere notice by the employee to the employer that he has sustained an injury is not sufficient. He must convey to the employer or the employer's foreman or superintendent that the condition is causally related to his employment." *Davidson v. Bermo, Inc.*, 272 Minn. 97, 101, 137 N.W.2d 567, 571 (1965), *quoted with approval in Kling v. St. Barnabas Hospital*, 291 Minn. 257, 261, 190 N.W.2d 674, 677–78 (1971). *See Pojanowski v. Hart*, 288 Minn. 77, 81, 178 N.W.2d 913, 916 (1970).

In the instant matter, Dr. Martinson had actual knowledge that respondent was severely injured in an automobile accident while driving home; she also knew that respondent performed a good portion of her work on the proposal at her home. Dr. Martinson, however, had no knowledge that respondent had been working on the project at the University on the day of her accident, or that she was on her way home from the University when injured. Thus, even if Dr. Martinson is charged with knowledge that respondent was in fact an employee of the University and that employees are sometimes eligible for workers' compensation coverage if injured while traveling between two work premises, it is difficult to find that she, or any reasonable employer, should have been put on inquiry simply by virtue of her knowledge of the automobile accident. A fortiori, neither Dean Isabel Harris nor the administrative assistants who signed respondent's paycheck in late June 1973 can be charged with actual knowledge.

Accordingly, I would hold that Mrs. Kahn's injury was not work-related and that in any event there was no notice to the employer within the period prescribed by statute.

ROGOSHESKE, Justice (dissenting).

I join in the dissent of OTIS, J.

PETERSON, Justice (dissenting).

I join in the dissent of OTIS, J.

TODD, Justice (dissenting in part).

I join in the dissent of OTIS, J., as to lack of proper statutory notice.