KARLSTAD STATE BANK, Respondent,

v.

Louis A. FRITSCHE, et al., Appellants.

Louis A. FRITSCHE, et al., Appellants,

v.

KARLSTAD STATE BANK, Stuart Folland, Production Credit Association of Grand Forks, Respondents.

and

KARLSTAD STATE BANK, Respondent,

v.

NORTHWEST PINZGAUER BREEDERS, LTD., et al., Appellants.

No. C3–85–13.

Court of Appeals of Minnesota.

Sept. 10, 1985.

William A. Schlossman, Jr., Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., Fargo, N.D., for Karlstad State Bank.

Benjamin S. Houge, Brooklyn Center, for appellants.

Paula D. Osborn, W. Joseph Bruckner, Oppenheimer, Wolff, Foster, Shepard & Donnelly, St. Paul, for Production Credit Association of Grand Forks.

Heard, considered and decided by PARKER, P.J., and FORSBERG and HUSPENI, JJ.

## OPINION

PARKER, Judge.

Louis and Jeanette Fritsche were in the business of breeding exotic cattle and obtained financing from the Karlstad State Bank and the Production Credit Association of Grand Forks. This action involves three lawsuits related to their cattle business that were consolidated for trial.

In the first, Karlstad State Bank sued the Fritsches individually to foreclose on collateral pledged as security and to obtain a deficiency judgment. The Fritsches asserted a counterclaim for fraud and alleged the foreclosure sale of their cattle was commercially unreasonable. In the second action, the Fritsches and their business entities (Minnesota Pinzgauer Enterprises, Inc. (MPE) and Northwest Pinzgauer Breeders, Ltd. (NWPB)) sued the bank, its president, and the PCA, alleging essentially the same claims they asserted in their counterclaim. In the third action, the bank sued the Fritsches and their business entities seeking to foreclose on other collateral that had been assigned to the bank as security and to obtain a deficiency judgment.

In December 1983 the parties reached a partial settlement of the bank's foreclosure actions. As part of that settlement, the

Fritsches, MPE, and NWPB agreed that they were jointly and severally liable to the bank for $1.2 million in principal and interest.

In June 1984, the trial court granted summary judgment in favor of the bank and the PCA and dismissed all the fraud and negligence claims asserted by the Fritsches. The trial, which was to the court, concerned only the issue of the commercial reasonableness of the foreclosure sale. Because the bank argued that the Fritsches were estopped by their fraudulent conduct from contesting the sale, much of the Fritsches' evidence relating to their own fraud claim was admitted and considered by the trial court. The court concluded that the auction sale was commercially reasonable, and a deficiency judgment was entered against the Fritsches for the amount stipulated plus accrued interest.

The Fritsches appeal the trial court's determination that the auction was commercially reasonable, and they allege that they were improperly denied a jury trial on that issue. In addition, they appeal the court's grant of summary judgment on their claims of fraud and negligence. We affirm.

## FACTS

The trial court did an outstanding job of clarifying this complex factual situation, which spans the course of about ten years.

In 1974 Louis Fritsche, a veterinarian, and Jeanette Fritsche, a teacher, became interested in breeding Pinzgauer cattle. Pinzgauers are an Austrian breed of cattle that is relatively rare in the United States. The Fritsches purchased a herd of about 150 Hereford cattle in order to establish an upbreeding program under which the Herefords were bred to full blood Pinzgauers. The Fritsches did business as the J.B. Fritsche Cattle Co.

To finance acquisition of the herd and operating expenses, the Fritsches obtained loans from the Karlstad State Bank. At that time, the bank's president and chief operating officer was Stuart Folland. Be-

cause the bank had a $70,000 lending limit, it sought participation of the PCA of Grand Forks in the loans to the Fritsches. Folland became a personal friend of the Fritsches, and the distinction between his status as a friend and business advisor as compared to his status as their banker is critically important in their claim against him.

In 1975 the Fritsches needed additional capital and decided to form a limited partnership, called Northwest Pinzgauer Breeders, Ltd. The sole general partner was Minnesota Pinzgauer Enterprises, Inc., a corporation owned completely by the Fritsches. An underwriting company offered 25 limited partnership units for sale at $20,000 each. The limited partnership, the bank, and the underwriter entered into an impoundment agreement, under which amounts paid for the purchase of partnership units would be held in escrow by the bank. The funds were to be disbursed to the limited partnership if subscriptions totaled $200,000 and the limited partnership received a $240,000 term loan by December 31, 1976. If those terms were not met, the bank was to return all funds to the investors.

In December 1976 the Fritsches became aware that an insufficient number of partnership units had been sold, and they agreed, with the advice of counsel, to purchase the unsold units in order to meet the terms of the impoundment agreement. The bank agreed to finance the Fritsches' purchase of the unsold units. The $240,000 term loan plus a $230,000 working capital loan were made in early January 1977. Minnesota Pinzgauer Enterprises, the corporation, guaranteed the partnership loans. The Fritsches individually guaranteed payment of the corporation's obligations. The PCA participated in these loans.

In January 1979 a PCA examiner concluded that "[s]ound loan analysis and adequate controls have not been provided by the local bank and PCA on this high risk venture." The examiner pointed out that although the corporation had guaranteed

the partnership loans, and the Fritsches had guaranteed the corporation's obligations, the Fritsches had not individually guaranteed the partnership loans. To satisfy the PCA's concerns, and as a condition of the 1979 loan renewal, the Fritsches signed a collection guarantee for the partnership's line of credit. The examiner also pointed out that NWPB was probably ineligible for PCA financing because it appears to be a tax shelter.

In December 1979, three notes owed by the partnership to the bank with a principal balance of $732,000 were past due. In March 1980, Stuart Folland was removed as president of the bank by order of the State Commissioner of Banking for misconduct unrelated to this action; however, he continued to be the bank's principal stockholder, he maintained an office at the bank, and he continued to be involved with administering the NWPB loan. The bank now contends he was acting as an independent financial consultant to the Fritsches rather than as its agent. Sometime in March 1980 Folland provided the PCA with an inventory list that substantially overstated the number of cattle in the NWPB herd. In April 1980 the PCA refused to accept any additional participation loans through the Karlstad State Bank until the NWPB loan situation was "clarified."

In July 1980 the parties entered into a workout agreement, which required the Fritsches to liquidate the herd no later than December 31, 1980. The PCA advanced $150,000 to cover maintaining the herd until the sale. The Fritsches assigned their interest in two contracts for deed as security for the partnership's obligations. Although the Fritsches attempted to sell the cattle to a Texas buyer, the herd was not sold by the deadline in the workout agreement.

In January 1981 the parties executed another workout agreement, under which the cattle were to be moved to a farm chosen by the Fritsches in Raymore, Missouri, and sold at public auction no later than May 2, 1981. The bank advanced an additional $130,000 to move the herd, promote the sale, and pay for maintenance of the cattle. As a condition to the move, the bank required the Fritsches to produce a written sales agreement between them and auctioneer Stanley Stout providing that the cattle would be sold by May 2, 1981. Jeanette Fritsche delivered to the bank a purported sales agreement containing those terms; however, Stout did not sign it, and at trial Jeanette Fritsche said she had signed Stout's name to the document under Stuart Folland's direction.

The trial court found that despite the agreement with the bank, the Fritsches "had no intention of having a public auction sale * * * and made no preparations for such a sale. Instead, [they] chose to gamble on the availability of alternate financing * * *." The alternate financing they anticipated was sought by Stuart Folland and included the possible formation of a second limited partnership. The bank notified NWPB of its intent to foreclose on the collateral in early May. In June 1981 the partnership voluntarily relinquished possession of the herd to the bank, but the Fritsches remained responsible for caring for the cattle. The bank hired the Stanley Stout Auction Service to run the dispersion sale. Stout advised the bank to postpone a sale until the fall for various reasons. The bank obtained two appraisals for the herd: one for $316,000, and the other for $328,000. The sale was scheduled for September 22.

One week before the sale was to take place, the Fritsches obtained a temporary injunction to stop it. The injunction was lifted the day before the sale when the Fritsches were unable to post the required bond. The sale took place as planned, and gross receipts amounted to about $325,000.

## ISSUES

1. Was the dispersion sale conducted in a commercially reasonable manner?

2. Did the Fritsches waive their right to a jury trial on that issue?

3. Did the trial court err in granting summary judgment to the bank and the

PCA on the Fritsches' claims of fraud and negligence?

## I

■ Upon default, a secured party seeking a deficiency judgment is obligated to dispose of collateral in a commercially reasonable manner. *See* Minn.Stat. § 336.-9–504(3) (1984). The sale may be public or private, but "every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable." *Id.* The burden of proof is on the secured party to show the commercial reasonableness of a sale. *See Chemlease Worldwide Inc. v. Brace, Inc.*, 338 N.W.2d 428, 437 (Minn.1983). Once a prima facie case is made by the secured party, the burden of persuasion shifts to the party contesting the sale to show specific evidence of commercial unreasonableness, *see Fedders Corp. v. Taylor*, 473 F.Supp. 961, 972 (D.Minn.1979), and to establish the amount of the loss incurred, *see Chemlease*, 338 N.W.2d at 437. The issue of whether a sale is commercially reasonable is a question of fact subject to the clearly erroneous standard of review. *See id.;* Minn.R.Civ.P. 52.01.

The parties do not dispute the following facts: The cattle were sold at public auction during regular business hours. The location was within easy driving distance of Kansas City. The sale was advertised in livestock journals for several weeks and in local newspaper and radio ads. Prospective buyers were contacted in person, by mail, and by telephone. The sale was conducted by experienced auctioneers and was attended by 150–185 people. The bidding was lively, and the sale lasted from 11 a.m. to 5 or 6 p.m. The trial court found that the time, place, method, manner, and terms of the sale were commercially reasonable and in accord with the customary practice in the cattle business. In addition, the trial court found that the sale price, $325,000, was fair.

The Fritsches contend these findings are erroneous in three respects: first, they argue the sale price was unreasonable as a matter of law because it was less than the slaughter value; second, they argue the bank failed to advertise the sale properly; and third, they argue the cattle were in poor condition the day of the sale because they had been deprived of food and water immediately beforehand.

### Sale Price

The Fritsches argue that the price received for the cattle was unfair because it was less than the stockyard slaughter price would have been. They offered no expert testimony on the slaughter price; instead, Jeanette Fritsche estimated the slaughter value at $448,000 by using market quotes and weight estimates which she prepared. The weight estimates were based on actual weighings performed in May of 1981, with "average daily gain" projected to the date of sale. The average daily gain figure was taken from the Fritsches' own "historical data," computed over a period of several years when the herd was penned in northern Minnesota. The bank's two appraisers testified in contrast that the price was fair for a dispersion sale of the entire herd and exceeded the slaughter value.

■ The trial court found specifically that Pinzgauer cattle had not been commercially established in the United States and that the "last-minute uncertainty" about whether the sale would take place, due to the temporary injunction, may have affected the outcome of the sale. In addition, the trial court's memorandum says:

> [T]he Fritsches had earlier agreed to a public auction. Experts testified that a public auction was the best way to dispose of the herd. The fact that the public auction brought less than was hoped for is of no consequence if the public auction was conducted in a commercially reasonable manner. * * * [T]he price received for the herd was consistent with the earlier appraisals * * *. The actual value of this herd was what the buyers were willing to pay on September 22, 1981. Any other value, for the entire herd, is just speculation.

### Advertising

The Fritsches argue next that the bank failed to advertise the sale in a commercially reasonable manner. Specifically, they say the bank agreed to mail a printed catalog to prospective buyers but instead distributed a less sophisticated catalog at the sale. Stanley Stout testified that he attempted to get the pedigree information from the Fritsches but that they provided it too late for publication.

The trial court's memorandum says: It is apparent that the Fritsches resisted the sale of the herd, even seeking a court order, just days before the sale, to enjoin it. The Fritsches must share the blame for the failure to obtain and catalog, in a timely manner, detailed information concerning the herd. My impression, as trier of fact, is that the Fritsches hoped to the very end, that money from some source would materialize, and that the sale could be avoided.

### Condition of the Cattle

Finally, the Fritsches contend that the cattle were deprived of food and water immediately before the sale, so they were dehydrated and emaciated the day of the sale. The trial court found that cattle frequently exhibit a condition called "gauntness or gut shrink" when they are worked for sale, and that in every sale of a large number of cattle, experienced cattle operators would expect to see a few animals that remained in that condition. In addition, Louis Fritsche testified that the cattle never really adjusted to the move to Missouri, and their overall condition there was not as good as it had been in Minnesota. The trial court said of the conditions immediately before the sale:

> There may not have been water in each pen, but there were water tanks throughout the area. The conditions admittedly were not ideal but they were adequate to keep the cattle for the short period of time before auction.

The trial court essentially found that the condition of the cattle was attributable to the Fritsches, because they chose the Missouri site and because their attempts to stall the sale caused the delay.

Minn.Stat. § 336.9–507(2) (1984) provides:

> The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner.

*Id.*

The evidence supports the trial court's finding that all aspects of the sale were commercially reasonable. The bank made out a prima facie case of reasonableness, especially when considered against the background of the Fritsches' own actions. The Fritsches failed to meet their burden of showing specific evidence of unreasonableness or to establish their damages by showing what the herd was worth.

### II

The Fritsches contend that they were improperly denied their right to a jury trial under the Minnesota Constitution. *See* Minn. Const. art. I, § 4. The record shows that they demanded a jury trial in their note of issue and in a motion dated December 15, 1983. The trial court denied the motion for a jury trial at that time, on the ground that

> [a]ctions to foreclose mortgages are primarily equitable, and the determination of the equitable issues may well be dispositive. If they are not, the court will then determine if the legal issues will be submitted to the court or if a jury should be empaneled. Pending that determination to be made at the completion of Plaintiff Karlstad State Bank's cases in

chief, all parties should be prepared to proceed on all issues in all cases * * *. The trial court thus clearly left open the possibility that a jury trial would take place.

In February 1984 the parties signed a stipulation of partial settlement, which provided in part:

The issues to be resolved at the trial of this matter shall be limited to the damage issues raised by the Amended Complaint by Northwest Pinzgauer, Minnesota Pinzgauer and the Fritsches * *. Notwithstanding the partial settlement of the Bank's mortgage foreclosure action and the transfer of the property hereunder in lieu of foreclosure, the issue concerning the commercial reasonableness of the September 22, 1981 sale shall, in accordance with the December 30, 1983 Order of the Court and subsequent correspondence, be tried to the Court. Northwest Pinzgauer, Minnesota Pinzgauer and the Fritsches reserve the right to appeal from the December 30, 1983 Order of the Court. Any appeal shall be based on the decision of the Court based solely on the posture of this action prior to January 31, 1983 and without regard to this agreement and the posture of the case as a result thereof.

On June 14, 1984, the trial court granted the bank's and the PCA's motions for summary judgment on the tort claims. The trial court's memorandum accompanying the order regarding the commercial reasonableness trial provides the only information in the record as to what happened after that point:

At the conclusion of this case, counsel for the Fritsches suggested that they had been denied, wrongfully, a trial by jury. By order of December 30, 1983, Judge Saetre denied the Fritsches' motion for jury trial. The matter was then in the form of a mortgage foreclosure action. That portion of the lawsuit was subsequently settled. A pretrial conference was held June 4, 1984. *It was the consensus of all present, including counsel for the Fritsches, that we would proceed to a jury trial on the fraud and negligence allegations,* if summary judgment were not granted, *and that the commercial reasonableness of the sale issue would follow, being tried to the Court alone,* with the Court being permitted to make findings of fact from both the jury case as well as the court case. No one objected to proceeding in this manner. Subsequently, by order of June 14, 1984, summary judgment was granted in the case to be tried to jury. *No objection was made to trying the remainder of the case to the Court alone until counsel for the Fritsches objected to such in his closing argument.* Under the circumstances, the right to trial by jury was waived.

(emphasis added). The closing arguments were not transcribed.

■ This memorandum basically contains a finding of fact that the Fritsches agreed to a court trial on this issue during the June 4 conference. The Fritsches did not make a motion for a new trial or amended findings after trial to clarify this issue. They do not address the court's ruling on waiver in their brief, but focus instead on the documentary evidence showing that they demanded a jury trial. We must conclude that the Fritsches waived their right to a jury trial by submitting to a court trial without objection and raising the issue for the first time in final argument. *See, e.g., Parsons Electric Co. v. Village of Watertown,* 283 Minn. 505, 509–10, 169 N.W.2d 20, 23 (1969) (in an action to secure both a mechanics lien and a money judgment, defendant waived his right to jury trial by raising it for the first time in a motion for a new trial).

### III

■ The Fritsches raised numerous claims of fraud and negligence against Stuart Folland, Karlstad State Bank, and the PCA. One of their claims is that they had a fiduciary relationship with Folland, which he breached by failing to fully disclose the PCA's participation in the loans and the import of their personal guarantee

of the partnership's obligations. The trial court granted summary judgment to the bank and the PCA largely on the ground that neither the bank nor the PCA had a fiduciary relationship with the Fritsches and that a lender generally has no special duty to counsel a debtor regarding a loan transaction. *See Klein v. First Edina National Bank*, 293 Minn. 418, 196 N.W.2d 619 (1972). The Fritsches appealed from the order for summary judgment. We do not reach this issue because an order granting partial summary judgment is not final or appealable as of right.

The Fritsches asserted tort claims against the bank, the PCA, and Stuart Folland in their counterclaim and in their own action. The parties agreed to consolidate the tort claims but to try the dispersion sale issue separately. The trial court then granted summary judgment in favor of the bank and the PCA on the tort claims; however, the action against Stuart Folland is still pending.

Under Minn.R.Civ.P. 54.02, "any order directing the entry of judgment as to fewer than all the claims or parties, which does not contain an express determination that there is no reason for delay, does not become final and is subject to revision at any time prior to the entry of judgment adjudicating all the claims, rights, and liabilities of all the parties." *Pederson v. Rose Cooperative Creamery Association*, 326 N.W.2d 657, 660 (Minn.1982). Rule 54.02 provides:

> When multiple claims for relief or multiple parties are involved in an action, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate

the action as to any of the claims or parties * * *.

*See also Buchman Plumbing Co. v. Regents of University of Minnesota*, 293 Minn. 437, 196 N.W.2d 629 (1972).

In this case the trial court did not make the express determination or direction required by the rule, nor would it have been appropriate to do so. "If the effect of a final decision as to one party * * would adversely affect the other parties * * *, then the court should not direct the entry of final judgment." 2A D. Herr & R. Haydock, *Minnesota Practice* § 54.9, at 9 (1985). In the absence of a final decision as to Stuart Folland's liability, the *vicarious* liability of the bank and the PCA is still unresolved. The summary judgment order is thus subject to revision. For the same reason, it would be inappropriate to extend discretionary review.

### DECISION

The trial court did not err in finding that all aspects of the dispersion sale were conducted in a commercially reasonable manner or that appellants waived their right to a jury trial by submitting to a court trial without objection.

We do not reach the issue of whether the trial court erred in granting summary judgment in favor of the bank and the PCA because an order for partial summary judgment is not appealable.

Affirmed.