Lawrence SCHWEICH, et al.,
Appellants,

and

Minnesota Assigned Risk Plan, through Employee Benefit Administration, Intervenor, Respondent,

v.

ZIEGLER, INC., Defendant and Third-Party Plaintiff, Appellant,

Gibbs–Cook Equipment Co., Caterpillar, Inc., Defendants and Third–Party Plaintiffs, Respondents,

v.

LAWRENCE SCHWEICH HOME BUILDERS, INC., Third–Party Defendant, Respondent.

Nos. CX–89–2124, CX–90–430.

Supreme Court of Minnesota.

Nov. 30, 1990.

Rehearing Denied Feb. 15, 1991.

Eric J. Magnuson, Amy K. Adams, Rider, Bennett, Egan & Arundel, Jay T. Hartman, Kevin L. Stephenson, Gilmore, Aafedt, Forde, Anderson & Gray, P.A., Minneapolis, for appellants.

Harry A. Sieben, Sieben, Grose, Von Holtum, McCoy & Carey, Ltd., Paul C. Peterson, Kay Nord Hunt, Lommen, Nelson, Cole & Stageberg, P.A., Minneapolis, Wayne D. Tritbough, Chadwick, Johnson & Condon, P.A., Edina, G. Alan Cunningham, Linda S. Svitak, Faegre & Benson, Minneapolis, for respondents.

POPOVICH, Chief Justice.

This case rises from an action for damages for injuries suffered by plaintiffs Lawrence and Bonita Schweich after Lawrence Schweich fell while attempting to mount a D6H Caterpillar tractor. Seeking compensatory and loss of consortium damages, Schweichs commenced a products liability action in Scott County District Court against the sellers, defendant/appellant Ziegler, Inc. (Ziegler) and defendant Gibbs–Cook, Inc. (Gibbs–Cook), and the manufacturer, defendant Caterpillar, Inc. (Caterpillar). The trial court found Ziegler was negligent and breached express and implied warranties. On appeal are issues regarding (a) the demand for a jury trial, (b) sufficiency of the evidence, (c) "newly discovered" evidence of the injured plaintiff's physical abilities, (d) constitutionality of Minn.Stat. § 549.23 (1988), and (e) the allocation of the tort recovery award between the injured plaintiff and the subrogated employer. We affirm in part and reverse in part, remanding for the allocation under Minn.Stat. § 176.061, subd. 6 (1990).

## I.

At approximately 6:15 a.m. on May 29, 1987, Lawrence Schweich was seriously injured when he fell while ascending a new Caterpillar D6H tractor. The fall was caused when the rear bolt of the grab handle used by Schweich came loose, causing Schweich to fall backwards to the ground. Lawrence Schweich was employed by Lawrence Schweich Home Builders, Inc. (LSHB), a corporation engaged in the excavation and home construction business. Schweich recalls ascending the D6H tractor, but remembers nothing of his fall or its cause.

The D6H tractor was manufactured by Caterpillar at its Davenport plant in 1987. The D6H is a bulldozer-type machine operating on movable tracks. The cab of the D6H is accessible from either side through two doors. The D6H has grab handles attached to a fender located above the machine's tracks. The grab handle, which is roughly one foot wide, is secured to the fender by two bolts and washers. The offending grab handle was located on the right side of the D6H.

Before it was sold to LSHB, the D6H was shipped by Caterpillar to Las Vegas for exhibition. Caterpillar employees prepared the D6H for display, using and viewing the right grab handle. The D6H returned following the exhibition in April of 1987 to Gibbs–Cook in Des Moines. Between April 10 and May 27, 1987, Gibbs–Cook installed different tracks, a bulldozer attachment, heavy-duty batteries, and performed touch-up painting. On May 27, 1987, Gibbs–Cook delivered the D6H to Ziegler in Bloomington, Minnesota for sale to LSHB.

Several Ziegler employees inspected and examined the D6H upon arrival on May 27, 1987. None of the employees observed a loose right fender grab handle. The day foreman, Steve Geiser, ordered touch-up painting to be done on the trunnion areas, an area roughly equivalent to the hubcap area on a car. A final inspection of the D6H was performed between 4:00 and 5:30 p.m. on May 27th. This inspection required use of the right grab handle at least four times, and Ziegler employee Tim Cebulla testified the grab handle was tight when he performed the final inspection. There was no evidence of anyone having contact with the D6H after the final inspection until the following afternoon when LSHB employee Jamie Hennen picked up the D6H. Furthermore, there is no evidence of anyone having contact with the right grab handle after the final inspection until the handle came loose in Schweich's hands. Expert testimony revealed the rear grab handle bolt had, at one time, been properly torqued. Dr. Stuart Ross, a metallurgist, testified the grab handle had been repainted while the bolts were loose, and it was his opinion that the bolt loosened during transportation. Ross also testified the repainting could have occurred either before or after the accident.

Around 3:30 p.m. on May 28, 1987, Jamie Hennen, an employee of LSHB, picked up

the D6H from the Ziegler dealership and delivered it to LSHB in Prior Lake, Minnesota. When he arrived at LSHB, Jamie Hennen unloaded the D6H and drove it approximately 25 feet. Subsequently, Jamie's cousin, Victor Hennen, moved the D6H approximately 75 feet to the fuel tanks. Both men examined the tractor, checking fluid levels and untaping the exhaust stack. Although they both mounted and operated the D6H tractor at least twice, neither Jamie or Victor Hennen did so by way of the right side of the tractor. The D6H remained parked in the yard at LSHB until the next morning, May 29, 1987, when Lawrence Schweich directed the loading of the D6H onto a low-boy trailer. Victor Hennen operated the D6H as Lawrence Schweich directed the placement of the tractor from the ground. Lawrence Schweich then approached, ascending the right side of the D6H as it sat on the trailer. As Schweich grasped the right fender grab handle, the rear bolt of the handle came free, causing Lawrence Schweich to fall backwards. Victor Hennen witnessed Lawrence Schweich approach the right side of the tractor and heard Schweich shout as he fell backwards. Emergency personnel arriving on the scene observed the grab handle dangling from one bolt. The other grab handle bolt was found resting on the tractor tread.

Lawrence Schweich was hospitalized for eight days following his fall. Dr. John Berg, Schweich's regular physician, did not notice any memory or concentration difficulties in fourteen post-accident visits until December of 1987, when Schweich complained of memory and concentration problems. Experts diagnosed Lawrence Schweich as suffering from an organic brain injury, a torn right rotator cuff, and deep vein thrombophlebitis resulting from the fall. Testimony regarding Schweich's condition revealed he suffered from a litany of injuries and medical problems, including serious carbon monoxide poisoning nine months before the fall. Describing Lawrence Schweich as "an encyclopedia of medical problems," defendants' experts disputed claims of brain injury, contending Schweich was not permanently disabled,

that his problems were psychological and caused by carbon monoxide poisoning, not by the fall. Lawrence Schweich had been listed as partially or totally disabled a number of times on insurance forms.

In February of 1988, Lawrence and Bonita Schweich sued Caterpillar, Gibbs–Cook and Ziegler alleging strict liability and negligence in design, manufacture, maintenance, and inspection as well as breach of implied and express warranties. The Schweichs claimed Lawrence Schweich suffered an organic brain injury from the fall and is permanently disabled. In October of 1988, Schweichs filed a note of issue demanding a court trial. The Scott County Court Administrator mailed a trial notice, designating a court trial, and pre-trial questionnaires to each of the parties in December of 1988. Caterpillar, Gibbs–Cook and Ziegler returned their pre-trial questionnaires marked with the "Jury Trial" designation. None, however, filed a note of issue. Just prior to trial, Minnesota Assigned Risk Plan (MARP) intervened, asserting a subrogation interest for workers' compensation benefits paid to Lawrence Schweich on behalf of LSHB.

When the case was called for trial on June 20, 1989, Ziegler, Gibbs–Cook and Caterpillar demanded a jury trial. Counsel for the Schweichs had anticipated this demand, arriving that morning with a memorandum of law on the issue. The trial court ruled the demand for a jury trial was untimely under Minn.Stat. § 487.23, subd. 3 (1990), and proceeded to try the case. After a lengthy trial with considerable evidence concerning the cause of the accident and the extent of injuries suffered, the trial court found the grab handle loosened during repainting performed by Ziegler and that Ziegler alone was negligent. The trial court awarded Lawrence Schweich damages of $2,945,056.30 for past and future suffering, lost income, and medical expenses. Bonita Schweich was awarded damages of $680,200.00 for lost consortium.

In its motion for new trial, Ziegler offered videotaped post-trial surveillance of Lawrence Schweich as "newly discovered

evidence." The videotapes show Lawrence Schweich walking, purchasing a car, visiting an auction, attending the Courage Center, and driving his pickup truck. The Schweichs also brought a post-trial motion, seeking a declaration that Minn.Stat. § 549.23 (1988), the statutory cap on loss of consortium damages, violates the "certain remedy" guaranteed by the Minnesota Constitution. Rejecting the videotapes as merely impeaching and cumulative, the trial court declared the damages cap violative of Minn.Const. art. 1, § 8, and entered judgment against Ziegler. The trial court dismissed Schweichs' actions against Gibbs–Cook and Caterpillar, taxing costs and disbursements jointly against Schweichs and MARP.

Ziegler filed a notice of appeal with the court of appeals in November of 1989. Schweich also filed a notice of review, seeking the review of other issues. After accepting certification, this court dismissed Schweichs' notice of review in February of 1990. An immediate appeal followed, and in March of 1990 certification of Schweichs' appeal was granted and the appeals were consolidated.

## II.

■ The right to a jury trial is preserved not only in our state constitution, but also under the Rules of Civil Procedure. Minn. Const. art. 1, § 4; Minn.R.Civ.P. 38.01. Ziegler argues the trial court committed reversible error by denying Ziegler's request for a jury trial. Applying section 487.23, subd. 3 [1], the trial court ruled Ziegler effectively waived a jury trial by failing to file a jury note of issue within 10 days of receiving Schweichs' note of issue. Although section 487.23, subd. 3, was never formally adopted or published as the rule in the First Judicial District, the trial court

ruled this statutory rule of county court practice applied to district court actions in the First Judicial District. The statute, however, does not apply.

■ Before reorganization, both the county and district courts were permitted by statute to adopt rules governing practice in their respective courts. *See* Minn. Stat. §§ 480.055, 484.33, 487.23, subd. 2 (1990). The powers, duties, and jurisdiction of the county courts were transferred, by statute, to the district courts upon reorganization of the trial courts. Minn.Stat. § 487.191 (1990). This included the authority to adopt rules governing practice. *See* Minn.Stat. §§ 480.055, 484.33. The trial court reasoned that conferring the county court powers on the district court preserved, with equal effect and utility, the county court rules set forth in chapter 487. Section 487.191, however, granted the district court nothing more than what it already possessed; namely, the power to adopt rules of practice. The conferring statute states, in relevant part:

[T]here shall be one general trial court of the judicial district to be known as the district court, * * *.

Upon the effective date of a judicial district reorganization, the district court * * * shall also exercise the powers, duties, and jurisdiction conferred upon courts by this chapter and chapters 260, 484, 491, 492, 493, and 525.

Minn.Stat. § 487.191 (1990). The establishment of "one general trial court" leaves nothing upon which the county court rule of section 487.23 could operate. To construe these statutes as suggested by the trial court leads to the anomalous result of a unified district court applying statutory rules of a nonexistent court. While statutes governing court rules have been rec-

---

1. Section 487.23, subd. 3 states in relevant part:

 (b) *If any other party to the action desires a trial by jury* when none is demanded in the note of issue served upon the party, *the party shall serve a demand for trial by a jury* on all other parties to the action and file it with the court administrator, with proof of service, *within ten days after the note of issue was served upon the party.*

 (c) *If a jury is not demanded at the time and in the manner provided in sections 487.01 to 487.38, all parties waive trial by jury.* Jury trial may be waived also in the manner provided by rule 38.02 of the rules for municipal courts promulgated by the supreme court and rules promulgated by the supreme court from time to time for county courts.
 Minn.Stat. § 487.23, subd. 3(b), (c) (1990) (emphasis added).

ognized as a matter of comity, *see* Pirsig & Tietjen, *Court Procedure and the Separation of Powers in Minnesota*, 15 Wm. Mitchell L.Rev. 141, 182 (1989), the trial court cannot elevate a county court rule over the district court's own applicable rule. Apart from a specific calendar policy, the First Judicial District has no written rule governing the waiver of a jury trial. *See* First Judicial District Special Rules. The trial court even acknowledged this on the record. We will not reverse a correct decision simply because it is founded on incorrect reasons. *Kahn v. State*, 289 N.W.2d 737, 745 (Minn.1980). Although the county court rule in section 487.23, subd. 3 does not apply, a jury trial was not warranted because one was not properly demanded.

Unlike the federal practice of limiting the time for demanding a jury trial, Minnesota has no specific deadline for demanding a jury trial. *See* Fed.R.Civ.P. 38(b), (d) (jury trial waived unless demand is made within 10 days after last pleading directed to issue triable by jury). The lack of a deadline does not diminish a party's responsibility for making demand for a jury trial if one is desired. *Morton Brick & Tile Co. v. Sodergren*, 130 Minn. 252, 255, 153 N.W. 527, 528 (1915). The failure to timely demand a jury has always constituted a waiver of the right to a jury trial. *See Parsons Electric Co. v. Village of Watertown*, 283 Minn. 505, 509–10, 169 N.W.2d 20, 22–23 (1969) (demand not raised until post-trial motions); *Pearson v. Bertelson*, 249 Minn. 218, 223, 82 N.W.2d 66, 70 (1957) (demand not raised until second time on appeal); *Karlstad State Bank v. Fritsche*, 374 N.W.2d 177, 183 (Minn.App. 1985) (demand for jury trial during closing argument was too late); *March v. West Mall Partnership*, 367 N.W.2d 565, 567 (Minn.App.1985) (party never demanded jury trial at trial level); *see also* 2 D. Herr & R. Haydock, *Minnesota Practice*, § 38.10 at 75 (2d ed. 1985 & Supp.1990).

The failure to demand a jury trial is an unequivocal act from which the waiver is a necessary inference. *See Hasey v. McMullen*, 109 Minn. 332, 337, 123 N.W. 1078, 1079 (1909); *Poppitz v. German Insurance Co.*, 85 Minn. 118, 120, 88 N.W. 438, 439 (1901). In only one instance has this court held a demand made the day of trial to be a seasonable demand for jury trial. *See Williams v. Howes*, 137 Minn. 462, 463, 162 N.W. 1049 (1917). In *Williams*, the pro se plaintiff persistently voiced demand for jury trial since commencing the suit. *Id.* at 463–64, 162 N.W. at 1049. No waiver is established when a party's demands are contradictory, *see Weber Electric Co. v. Tuminelly, Inc.*, 296 Minn. 488, 489, 206 N.W.2d 656, 657 (1973) (party filed notes of issue demanding court and jury trial), or when venue is designated erroneously in the note of issue. *See Peterson v. Steinmaus*, 393 N.W.2d 693, 694 (Minn.App. 1986).

The circumstances of the present case confirm that Ziegler waived the right to a jury trial by failing to properly demand one. Schweichs' note of issue as well as the trial notice explicitly indicated the matter was set for court trial. In the face of these notices, Ziegler went no further to secure a jury trial than to simply mark the "jury trial" designation on the pretrial questionnaire. According to counsel, the matter of a jury trial was never mentioned again until the morning of trial. Unlike the plaintiff in *Williams*, Ziegler did not persistently demand a jury from the outset of the case. Ziegler argues, however, it reasonably believed the assertion of a jury trial on the pretrial questionnaire constituted a demand for a jury trial because the questionnaire must be completed by the parties and because Ziegler served the questionnaire on opposing counsel. This argument is meritless. Ziegler cites no authority for construing the pretrial questionnaire as the substantial equivalent of a demand for jury trial or a note of issue.[2]

---

2. In federal practice, the mere checking of the jury demand box on the civil cover sheet is insufficient demand for jury trial. *See Wall v. National Railroad Passenger Corp.*, 718 F.2d 906, 909 (9th Cir.1983); *Cochran v. Birkel*, 651 F.2d 1219, 1221 n. 4 (6th Cir.1981), *cert. denied* 454 U.S. 1152, 102 S.Ct. 1020, 71 L.Ed.2d 307 (1982); *The Personal Touch, Inc. v. Lenox, Inc.*, 122 F.R.D. 470, 471 (E.D.Pa.1988).

The pretrial questionnaire is obviously part of the case management system in the First Judicial District. It gives the trial court an overview of the entire case by requesting information on venue, the factual and legal issues involved, applicable statutes, exhibits, witnesses, whether the trial is by court or jury, and an estimated length of trial. Once completed, the questionnaire must be returned to the trial court and need not be served on opposing counsel. To construe the pretrial questionnaire as a formal demand for jury trial would enlarge the questionnaire beyond its intended purpose. It does not give formal notice to opposing counsel or, more importantly, to the trial court that a jury trial is sought. *See* Minn.R.Civ.P. 38.03 (party desiring to have action placed on the calendar shall prepare a note of issue). Even if the questionnaire was a demand for a jury, Ziegler can hardly expect a jury trial when it never tendered the requisite jury fee. This alone amounts to a waiver of the right to a jury trial. *Rollins v. Nolting,* 53 Minn. 232, 234, 54 N.W. 1118, 1119 (1893). Under these circumstances, Ziegler waived the right to jury trial by failing to demand one and failing to pay the requisite jury fee.

### III.

Both Ziegler and the Schweichs challenge the sufficiency of the evidence regarding the trial court's findings on negligence, breach of warranty and strict liability. The scope of review in a case tried by the court without a jury is limited to determining whether the court's findings are clearly erroneous and whether it erred in its conclusions of law. *Reserve Mining Co. v. State,* 310 N.W.2d 487, 490 (Minn. 1981). The question of negligence is for the trier of fact to determine and its verdict should not be disturbed unless there is no evidence which reasonably supports the verdict or it is manifestly contrary to the evidence. *See Smith v. Carriere,* 316 N.W.2d 574, 575 (Minn.1982) (jury trial).

### A. Findings Regarding Ziegler's Negligence.

Ziegler argues the evidence does not support the trial court's finding of a negli-

gent inspection. Specifically, Ziegler claims it had no duty to inspect the D6H and the findings demonstrate the trial court demanded Ziegler disprove its liability through the application of the res ipsa loquitur doctrine. The trial court denied it applied that doctrine. It said the evidence points to the "inescapable conclusion" that Ziegler was responsible for the loosened grab handle and failed to make a proper inspection before the D6H left Ziegler's possession.

The basic elements for negligence claim are (1) duty; (2) breach of that duty; (3) that the breach of duty be the proximate cause of plaintiff's injury; and (4) that plaintiff did in fact suffer injury. *Hudson v. Snyder Body, Inc.,* 326 N.W.2d 149, 157 (Minn.1982). Where the evidence is such that a trier of fact can do no more than guess or conjecture as to which of several acts was in fact the efficient cause, the plaintiff has failed to prove that the defendant's breach caused the injury. *See Nelson v. Wilkins Dodge, Inc.,* 256 N.W.2d 472, 475–76 (Minn.1977).

The trial court found Ziegler negligent in failing to perform an adequate inspection before the D6H left its possession. Based on the evidence, the trial court reasoned: (a) the grab handle was tight when the D6H arrived before touch up painting was ordered, (b) the grab handle was tight on final inspection before repainting and no one inspected or tampered with the grab handle until the accident and, therefore, (c) any loosening of the grab handle bolts must have occurred during the post-inspection painting. Although this reasoning infers the existence of causal facts for which there is no direct evidence, the evidence shows the grab handle was tight when the D6H arrived at Ziegler but was loose shortly after leaving Ziegler. " 'Circumstantial evidence which justifies an inference in support of the verdict upon the issue of negligence is adequate to sustain the verdict, even though it may justify other conflicting inferences, if the supporting inference reasonably outweighs and preponderates over the other conflicting inferences

and theories.'" *Smith v. Kahler Corp., Inc.*, 297 Minn. 272, 276, 211 N.W.2d 146, 150 (1973) (quoting *Knuth v. Murphy*, 237 Minn. 225, 230, 54 N.W.2d 771, 775 (1952)). The circumstantial evidence must be more than simply consistent with the plaintiff's theory of causation; reasonable minds must be able to conclude from the circumstances that the theory adopted outweighs and preponderates over opposing theories. *Smock v. Mankato Elks Club*, 203 Minn. 265, 266, 280 N.W. 851, 852 (1938). The circumstantial evidence here supports inferring Ziegler's liability for creating the defect; an inference outweighing and preponderating over other theories of causation.

The evidence shows Ziegler employees had the last contact with the right grab handle before the accident. Steve Geiser, shop foreman, testified he ordered touch up painting of the trunnion areas. The evidence does not indicate when Geiser ordered repainting, when painting was completed or who did the actual work. The grab handle, however, did evidence repainting that must have occurred when the bolts were loose. The inability to determine when the additional paint was applied to the grab handle does not diminish the probative value of the repainting. The trial court found the grab handle was tight, not only when the D6H arrived at Ziegler's premises on May 27th, but also when it was inspected later that day. No additional inspection was performed after the touch-up painting was completed. The evidence did not support finding the grab handle bolt loosened during shipping. Furthermore, as the trial court found, it is highly unlikely a single grab handle bolt would be the target of vandalism. In light of this evidence and the trial court's superior capacity to adjudge the credibility of the witnesses, the evidence is sufficient to sustain the trial court's findings of negligence by Ziegler.

### B. Findings Regarding Gibbs–Cook and Caterpillar.

Schweichs claim the evidence supports finding Gibbs–Cook and Caterpillar liable for negligence, breach of warranty, and strict liability. In the absence of a motion for a new trial against Gibbs–Cook or Caterpillar, appellate review is limited to examining whether the evidence supports the findings of fact and whether those findings support the conclusions of law. *Gruenhagen v. Larson*, 310 Minn. 454, 458, 246 N.W.2d 565, 569 (1976).

■ The evidence supports the trial court's finding that neither Gibbs–Cook nor Caterpillar was negligent. The evidence shows and the trial court found the grab handle was tight and secure when the D6H tractor left the possession of both Caterpillar and Gibbs–Cook. Nine individuals, many of whom were trained mechanics who worked on the D6H tractor before it reached Ziegler, testified that they never observed or noticed a loose bolt or grab handle while the D6H was in possession of either Caterpillar or Gibbs–Cook. The Schweichs also claim Caterpillar's warning in the D6H owner's manual was inadequate. While the trial court found that the instruction manual could have been written better, this was inconsequential given Lawrence Schweich's noted familiarity with the instructions contained in the manual.

■ The trial court properly rejected Schweichs' argument of an agency relationship between Caterpillar, Gibbs–Cook and Ziegler. The trial court found Caterpillar had no right to control the manner of performance of Gibbs–Cook or Ziegler, and did not otherwise hold out Gibbs–Cook or Ziegler as its agents, notwithstanding use of the Caterpillar name for promotional purposes and supply of forms to its dealers to record modifications and repairs. Nothing in the record indicates Caterpillar enjoyed any right to control the operations or performance of Gibbs–Cook or Ziegler. *See Guhlke v. Roberts Truck Lines*, 268 Minn. 141, 143, 128 N.W.2d 324, 326 (1964).

■ Schweichs also maintain the evidence supports finding that both Caterpillar and Gibbs–Cook breached warranties and are strictly liable. To prevail on a warranty claim the plaintiff must prove the existence of a warranty, a breach, and a causal link between the breach and the alleged harm. *See Peterson v. Bendix Home Systems, Inc.*, 318 N.W.2d 50, 52–53

(1982). Although all three defendants were found to have made express and implied warranties, only Ziegler breached its warranty. Because the trial court found the grab handle was tight when it left Caterpillar and Gibbs–Cook, and Schweich does not dispute this finding, there is neither a breach of warranty or a causal connection.

 Similarly, Schweichs' claims of strict liability also fail. Schweichs contend Gibbs–Cook is strictly liable under Minn. Stat. § 544.41, subd. 3 (1990) because Gibbs–Cook replaced the machine's tracks, adding a ripper attachment, and installed other minor equipment on the D6H. Regardless of whether these modifications amounted to an exercise of significant control over the manufacture of the D6H under Minn.Stat. § 544.41, subd. 3 (1990), there was no defective condition in the D6H when it reached or left Gibbs–Cook's possession. Furthermore, the trial court found these modifications did not create the defect causing injury. *See Stewart v. Ford Motor Co.*, 553 F.2d 130, 137 (D.C.Cir. 1977).

 Likewise, the evidence supports the trial court's findings that Caterpillar's use of a bolted grab handle design was safer than the alternatives suggested by the Schweichs. Thomas Crane, a consulting engineer experienced in fastener joint design, and William J. Lux, a mechanical engineer, each testified the grab handle bolt attachment used by Caterpillar was preferable to welding or self-taping screws because the location of the grab handle would subject it to possible damage. A welded joint would not provide serviceability or give visible indication of impending failure. Caterpillar is duty bound to use reasonable care in designing the D6H to protect users from unreasonable risk of harm while using it in a foreseeable manner. *See Holm v. Sponco Mfg., Inc.*, 324 N.W.2d 207, 212–13 (Minn.1982). The evidence adduced shows the bolt method attachment was a reasonable choice in designing the D6H machine.

IV.

 Ziegler urges a new trial should be granted based on newly discovered evidence of Lawrence Schweich's physical abilities. It claims the covert surveillance videotapes are conclusive proof, revealing Lawrence Schweich to be a markedly different and able person with injuries much less extreme than found by the trial court. Whether to grant a new trial for newly discovered evidence is a decision committed to the trial court's discretion. *Hertz v. Hertz*, 304 Minn. 144, 146, 229 N.W.2d 42, 44 (1975). Newly discovered evidence which is cumulative, impeaching or contradictory does not warrant a new trial. *See, e.g., Swanson v. Williams*, 303 Minn. 433, 435–36, 228 N.W.2d 860, 862 (1975); *see also Minder v. Peterson*, 254 Minn. 82, 91–92, 93 N.W.2d 699, 706–07 (1958) (post-trial affidavit stating truck driver admitted to affiant that brakes were defective held merely cumulative, contradictory, and impeaching).

 Ziegler's case-in-chief presented the testimony of neurologists, psychologists, and orthopedic surgeons, suggesting that Lawrence Schweich was not so severely injured, that his abilities were far greater than he testified, and that his infirmities were attributable to carbon monoxide poisoning, not the fall. The videotapes, Ziegler urges, "demonstrably prove[ ] that Schweich is capable of walking, talking, driving, and socializing with strangers for long periods of time." Ziegler relies on *Cofran v. Swanman*, 225 Minn. 40, 29 N.W.2d 448 (1947), claiming that facts proven by demonstration, as in the videotape, control over contrary witness testimony. This case is inapposite, and the argument misconceives the case heard by the trial court.

In *Cofran*, the weight of physical evidence regarding the cause of the accident not only contradicted witness testimony, but it eliminated any possibility of the accident occurring as the witnesses had testified. 225 Minn. at 47, 29 N.W.2d at 452. The physical evidence offered by Ziegler does not pertain to how the accident happened, rather it seeks to directly impugn

witness testimony supporting the verdict. Ziegler's post-trial videotapes, for the most part, accord with this testimony and Ziegler's overall trial theory that Lawrence Schweich's injuries were more psychological than physical, and that he would improve after the trial ended. Moreover, the videotapes show nothing contrary to the trial testimony of Lawrence Schweich or the expert witnesses.

At issue here was not merely whether Lawrence Schweich could walk, talk or drive a motor vehicle. Schweichs offered testimony from a battery of experts that Lawrence Schweich is permanently disabled by an organic brain injury suffered in the fall. Experts also testified that Lawrence Schweich would mask his inabilities, making diagnosis and treatment difficult. Lawrence Schweich testified he was afraid to drive for fear of getting lost. He also testified that "climbing isn't bad now" and he uses his right leg first when he does climb on machinery. The videotapes show Schweich performing various activities: walking dogs, inspecting equipment alone at an auction, purchasing a car, performing minor work on the car, walking $\frac{4}{10}$ths mile, driving alone, and speaking with various people. Ziegler emphasizes the videotapes show Schweich's ability to interact with others as well as perform various activities. That he was able to do these activities does not, however, mean the activities were performed without pain or fear. The videotapes show Lawrence Schweich was taciturn at the auction, spending most of his time alone, speaking hesitantly with Ziegler's investigators, climbing, left leg first, into the rear of his pickup truck. Ziegler's own affiants described Lawrence Schweich as being "distant" and "nervous."

Newly discovered evidence does not warrant a new trial unless the evidence is of the quality and caliber that it would likely produce a different result at trial. *Viske v. Flaby*, 316 N.W.2d 276, 284 (Minn.

1982). Ziegler claims the present case is similar to *Disch v. Helary, Inc.*, 382 N.W.2d 916 (Minn.App.1986), where the court of appeals found the "newly discovered" evidence was not only impeaching, but implicated a conspiracy to commit perjury. Ziegler argues a new trial is warranted here because "the trial court's decision was based largely on the acceptance of Schweich as a credible witness" and there was "a concerted effort to misrepresent or overstate the facts." This case does not present circumstances similar to those in *Disch*, where there was every indication the witnesses, under threat of termination of employment, perjured themselves. Not only do the witnesses here lack a collective, exploitable element, but witnesses beyond the Schweich family described tests, treatment, and the prognosis for Lawrence Schweich corroborating Schweich's own testimony of his limited capacities. The medical evidence, both physical and psychiatric, was thoroughly developed and presented to the trial court. Ziegler's "newly discovered" evidence falls under the rubric of cumulative, impeaching and contradictory evidence that would not likely produce a different result at trial. *See Great American Indemnity Co. v. Brown*, 307 F.2d 306, 309 (5th Cir.1962) (post-trial movie of plaintiff performing work did not establish basis for new trial); *Reggio v. Louisiana Gas Service Co.*, 333 So.2d 394, 395 (La.App.) (post-trial photographs relating to extent of disability did not warrant new trial), *cert. denied* 330 So.2d 320 (La. 1976).

### V.

The trial court declared section 549.23 denied due process under Minn. Const. art. 1, § 8, the "certain remedy" clause, to persons with loss of consortium claims exceeding the statutory damage cap.[3] Enacted as part of the Tort Reform

---

3. Section 549.23 provides in relevant part:
 Subdivision 1. Definition. For purposes of this section, "intangible loss" means embarrassment, emotional distress, and loss of consortium. Intangible loss does not include pain, disability or disfigurement.

 Subdivision 2. Limitation. In civil actions, whether based on contract or tort, the amount of damages per person for intangible losses may not exceed $400,000.
 Minn.Stat. § 549.23 (1988). This statute was repealed effective May 4, 1990, applying to

Act of 1986, section 549.23 limits the recovery of intangible losses to $400,000. *See* Act of March 25, 1986, ch. 455, § 88, 1986 Minn.Laws 840, 883–84. The constitutionality of this statute is presumed. *See Hickman v. Group Health Plan, Inc.,* 396 N.W.2d 10, 13 (Minn.1986). The party challenging a statute on constitutional grounds must show a constitutional violation beyond a reasonable doubt. *Snyder v. City of Minneapolis,* 441 N.W.2d 781, 788 (Minn.1989).

Article 1, section 8 of the Minnesota Constitution proclaims:

> Every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive to his person, property or character, and to obtain justice freely and without purchase, completely and without denial, promptly and without delay, conformable to the laws.

Minn. Const. art. 1, § 8. Although early interpretations viewed this clause as a fundamental right of the citizenry, *see, e.g., Davis v. Pierse,* 7 Minn. 13, 17–18 (Gil. 1, 5) (1862); *Agin v. Heyward,* 6 Minn. 110, 115 (Gil. 53, 59) (1861), this court has held the clause allows abrogation of common-law rights when replaced by a reasonable substitute, *see Breimhorst v. Beckman,* 227 Minn. 409, 435–36, 35 N.W.2d 719, 735–36 (1949), or when the legislature pursues a permissible legislative objective. *Haney v. International Harvester Co.,* 294 Minn. 375, 385, 201 N.W.2d 140, 146 (1972).[4]

In support of declaring the statute unconstitutional, the trial court remarked that the damages cap did not pursue the legislative objective of reducing insurance rates. The trial court noted that (1) the damages cap denies significantly aggrieved claimants equal protection under the law, (2) the damages cap applies to all civil actions, thereby negating the stated purpose of reducing insurance rates, (3) the damage cap applies on a per plaintiff, not per defendant, basis and is thereby inconsistent with the purpose of reducing insurance rates, and (4) the damage cap is unreasonably and arbitrarily low. These points appear to question the wisdom of section 549.23 more than its constitutionality. Ziegler asserts the damages cap is constitutional because it is rationally related to achieving the legitimate governmental purpose of reducing unpredictable damage awards and insurance costs—purposes similar to those advanced by limits on state tort liability and discounting of future damages. Schweichs argue case law does not establish that damage limitations against non-governmental entities advance a "permissible legislative objective." Schweichs' argument urges a "certain remedy in the laws for all injuries" means a remedy to the fullest extent found by the trier of fact.

■ Remedies are not vested rights, and section eight neither guarantees nor commands the continuation of a specific remedy. *State ex rel. Kane v. Stassen,* 208 Minn. 523, 527, 294 N.W. 647, 649 (1940) (remedy of mandamus not guaranteed to enforce rights under Veteran's Preference Act). In approaching challenges under section eight, we have not required that the legislature satisfy the legislative goals it pursues. Rather, our analysis centers on whether a permissible legislative goal is pursued when a common-law right is abrogated. *See Snyder,* 441 N.W.2d at 789. This court's analysis in *Snyder,* a case challenging the constitutionality of municipal tort liability caps, did not inquire whether capping municipal tort liability actually pursued or achieved the underlying legislative objective of ensuring governmental fiscal solvency. *See also Schmidt v. Modern Metals Foundry, Inc.,* 424 N.W.2d 538, 541–42 (Minn.1988) (noting amendments to the workers' compensation statutes authorizing new disability schedules appeared to be in furtherance of legitimate legislative objectives). Similarly, in *Tri–State Insurance Co. v. Bouma,* 306

---

causes of action arising on or after that date. Act of May 3, 1990, ch. 555, §§ 23, 24, 1990 Minn. Laws 1557, 1565.

**4.** One commentator notes the *Haney* test is not applied rigidly, favoring reading section eight as a guiding principle. Mickelsen, *The Use and Interpretation of Article I, Section Eight of the Minnesota Constitution 1861—1984,* 10 Wm. Mitchell L.Rev. 667, 694 (1984).

N.W.2d 564 (Minn.1981), we examined whether section eight was violated by a statute barring recovery of mistakenly overpaid workers' compensation benefits. This court concluded the statute embodied a permissible legislative objective of promoting general welfare by not mandating reimbursement of mistaken overpayment. *Id.* at 566. Again, we did not delve into whether general welfare was actually promoted by the legislative objective behind the statute. In many respects this analysis is reminiscent of the minimal judicial scrutiny of an equal protection or substantive due process review. *Compare Snyder,* 441 N.W.2d at 789, *with Imlay v. City of Lake Crystal,* 453 N.W.2d 326, 329–32 (Minn.1990). The focus in an equal protection challenge is on the lawmakers' reasonable belief, not on "whether all the statute's purposes are fully satisfied in every conceivable scenario." *Imlay,* 453 N.W.2d at 332. Likewise, the focus in a section eight challenge is on the legitimate purpose pursued by the legislature, not whether the statute meets that purpose in every constellation of fact. To extend our examination further would ignore the flexibility section eight enjoys.

> [W]hat constitutes "an adequate remedy" or "a certain remedy" is not determined by any inflexible rule found in the constitution, but is subject to variation and modification, as the state of society changes. Hence a wide latitude must, of necessity, be given to the legislature in determining both the form and the measure of the remedy for a wrong.

*Allen v. Pioneer–Press Co.,* 40 Minn. 117, 123, 41 N.W. 936, 938 (1889). In *Allen,* we also examined a section eight challenge to a limitation of damages, upholding a statute eliminating general damages recovery in libel actions when a retraction was printed. 40 Minn. at 124–25, 41 N.W. at 939.

In passing the Tort Reform Act of 1986, the legislature attempted to regulate the insurance industry and civil actions to provide predictability in damages awards while reducing insurance rates. *See* Act of March 25, 1986, ch. 455, 1986 Minn. Laws 840; Note, *Introduction to Minnesota's Tort Reform Act,* 13 Wm. Mitchell L.Rev.

277, 281 nn. 19 & 20, 284, 285–86 nn. 45 & 50, 291–301; *see also The Need for Legislative Reform of the Tort System: A Report on the Liability Crisis from Affected Organizations,* 10 Hamline L.Rev. 345, 385 (1987) (urging legislation establishing fixed or proportional limits on noneconomic damages). Limiting recovery for loss of consortium damages was only part of the legislature's response to the perceived crisis in the insurance industry. *See* Note, *Minnesota's Tort Reform Act,* 13 Wm. Mitchell L.Rev. at 277–86. It is suggested the legislature capped damages for those injuries with which it sympathized least. *Id.* at 300–01; Minn.Stat. § 549.23 (excluding limitation for pain, suffering and disfigurement). Considering the derivative nature of a loss of consortium claim and the underwriting challenges it presents, *cf. Huffer v. Kozitza,* 375 N.W.2d 480, 482 (Minn. 1985); *Togstad v. Vesely, Otto, Miller & Keefe,* 291 N.W.2d 686, 695 (Minn.1980), the damages cap on this injury appears to represent the legislature's attempt to lower rates for tort liability insurance. *See Johnson v. Farmers Union Central Exchange, Inc.,* 414 N.W.2d 425, 430–31 (Minn.App. 1987), *pet. for rev. denied* (Minn. Nov. 24, 1987). This court's past treatment of section eight challenges and limitations on municipal tort recovery indicates that a legitimate legislative purpose was pursued by enacting this statute. Lowering insurance rates and providing predictable damage awards are legitimate legislative objectives supporting the limitation embodied in section 549.23. The trial court erred in declaring section 549.23 violative of section eight of the Minnesota Constitution. The judgment should be reduced to the statutory maximum of $400,000.00.

## VI.

Intervenor MARP filed a notice of review challenging the taxation of costs and disbursements against it. MARP claims taxation of costs and disbursements against MARP was improper because it was an intervenor, not a party, who did not fail to sustain any claim. The act of intervention, however, is more than a form of

pleading. Through intervention, the intervening third-party becomes a party in the pending suit by interposing a claim of interest in an adversary proceeding, the results of which may be favorable or unfavorable depending on the outcome. *City of Minneapolis v. Minneapolis Transit Co.*, 270 Minn. 133, 137–38, 133 N.W.2d 364, 368 (1965); *Faricy v. St. Paul Investment & Savings Society*, 110 Minn. 311, 313, 125 N.W. 676, 677 (1910).

■ According to its complaint in intervention, MARP sought to protect its subrogation interest for workers' compensation benefits paid to Lawrence Schweich. *See Norman v. Refsland*, 383 N.W.2d 673, 676–78 (Minn.1986). It sought "judgment against the Defendants and Third–Party Defendants in the amount of Workers' Compensation benefits paid or payable to Plaintiff and * * * for its costs and disbursements incurred herein." Judgment was entered in favor of MARP against Ziegler. MARP moved for and was granted disbursement of the judgment pursuant to Minn.Stat. § 176.061, subd. 6 (1990). These pleadings and actions demonstrate claims were asserted against Gibbs–Cook and Caterpillar that were unsustained. MARP is, therefore, subject to taxation of costs. *See, e.g., Thief River Co–Operative Store Co. v. First Nat'l Bank of Thief River Falls*, 131 Minn. 193, 194–95, 154 N.W. 953, 954 (1915); *McKinley v. National Citizens Bank of Mankato*, 127 Minn. 212, 214–15, 149 N.W. 295, 296 (1914); *see also State ex rel. Bergin v. Fitzsimmons*, 226 Minn. 557, 565, 33 N.W.2d 854, 858 (1948) (intervenor entitled to costs as prevailing party where relator took neutral position and intervenor was real party in interest).

■ Alternatively, MARP urges costs and disbursements taxed jointly against MARP and the Schweichs should be included in the statutory formula of Minn.Stat. § 176.061, subd. 6, as "reasonable costs of collection." The statute does not define or limit what constitutes "reasonable costs of collection"; however, in *Hodder v. Goodyear Tire & Rubber Co.*, 426 N.W.2d 826, 838 (Minn.1988), *cert. denied* —— U.S. ——,

109 S.Ct. 3265, 106 L.Ed.2d 610 (1989), this court remarked that a plaintiff's costs taxed to another were properly excluded from the formula. The converse of this principle would require inclusion of costs taxed to a plaintiff.

In light of our language in *Hodder*, the trial court erred by including in the formula a percentage of Schweichs' costs. All of Schweichs' costs were taxed against Ziegler, and including those costs in the calculation under Minn.Stat. § 176.061, subd. 6, was improper because the Schweichs did not have to pay them. *Hodder*, 426 N.W.2d at 838. Additionally, the Schweichs remain jointly liable with MARP to Gibbs–Cook and Caterpillar for costs those defendants incurred. Those costs, properly taxed against the Schweichs, are "reasonable costs of collection" within the meaning of Minn.Stat. § 176.061, subd. 6. Remand is necessary to account for costs taxed against the Schweichs in the statutory formula. *See Kempa v. E.W. Coons Co.*, 370 N.W.2d 414, 419–20 (Minn.1985).

## VII.

The trial court's declaration that Minn. Stat. § 549.23 (1988) violates Minn. Const. art. 1, § 8, is reversed. The remaining judgment and orders are affirmed, except that the case is remanded (1) for reduction of judgment on the loss of consortium award; (2) for a recalculation under Minn. Stat. § 176.061, subd. 6, that (a) excludes plaintiff's costs taxed against another and (b) includes costs taxed against plaintiff; and (3) to revise judgment accordingly.

Affirmed in part, reversed in part, and remanded.

SIMONETT, J., took no part in the consideration of this case.

COYNE, Justice (dissenting).

I respectfully dissent. The right to trial by jury is expressly preserved by the Bill of Rights of both the United States Constitution and the Minnesota Constitution. U.S.Const. amend. VII; Minn. Const. art. I, § 4. The majority, however, arrogating unto itself the role of factfinder, has found

waiver of that constitutional right despite written notice, served and filed, of the expectation of all three defendants that the facts of this case would be found by a jury.

The trial notice issued in response to the plaintiff's note of issue demanding a court trial was accompanied by a pre-trial questionnaire. Each party was directed to complete the questionnaire and return it to the court. Each of the three defendants answered question 14—whether the trial was to be by jury or by the court—by stating that it was to be a jury trial. Each of the three defendants filed the questionnaire with the court, and defendants Ziegler and Gibbs–Cook also served it on the plaintiff. Nevertheless, when court convened on the appointed trial date the trial was still scheduled for trial by the court alone.

That the defendants' demand for a jury trial did not escape the attention of the plaintiff, even though it appears that neither the judge nor the court administrator had noted it, is obvious from the events immediately preceding the commencement of the trial. As soon as they became aware of the absence of a jury panel, the defendants orally renewed their demand for a jury trial. The plaintiff then presented a written memorandum in support of his position that the defendants should be denied a jury trial.

In denying the defendants' demand the trial court seems to have recognized that the defendants had not intentionally relinquished their right to a jury trial, for its ruling of a technical "waiver" was based on noncompliance with a nonexistent court rule. As the majority concedes, a statute setting rules of practice for an inferior court which no longer exists cannot supersede the Minnesota Rules of Civil Procedure. Unlike the federal rules [Fed.R. Civ.P. 38(b)], neither the Minnesota Rules of Civil Procedure nor the first judicial district's rules of practice set a format or deadline for a demand for jury trial. There are, of course, some practical limitations on the assertion of the right to a jury trial: a party cannot acquiesce in a court trial and then, when disappointed in the outcome, demand a jury trial. *See Parsons Electric*

*Co. v. Village of Watertown,* 283 Minn. 505, 509–10, 169 N.W.2d 20, 22–23 (1969); *Pearson v. Bertelson,* 249 Minn. 218, 223, 82 N.W.2d 66, 70 (1957). Here, however, both written and oral demands were made prior to trial.

The majority rather cavalierly dismisses the written demand made several months prior to trial as nothing more than simply marking "jury trial" on the court's questionnaire and then finds waiver in the failure to reiterate the demand prior to the morning of trial. Certainly, hindsight suggests the desirability of repeating the demand at the pre-trial conference, but unless one takes the position that the district court's pre-trial questionnaire is nothing but make-work, there should be no necessity for repetitive demands in order to preserve a constitutional right. A court should indulge every reasonable presumption against waiver. Moreover, a party should be able to rely on the assertion made in a document filed with the court and served on the adversary pursuant to the court's direction. To say, as does the majority, that such a demand is not a demand at all and that reiterating the demand as soon as it is apparent that the original demand has been overlooked and before trial commences constitutes the intentional relinquishment of the fundamental right to a jury trial seems to me to evince a scant regard for a right guaranteed by the Minnesota Constitution to remain inviolate.

Accordingly, I would reverse and remand to the district court for a jury trial.

WAHL, Justice (dissenting).

I join in the dissent of Justice Coyne.