FIRST NATIONAL BANK, Respondent,

v.

PROFIT PORK, LLC, Respondent,

Deere & Company, et al., Defendants,

New Vision Coop, Respondent,

Wilmont–Adrian Cooperative, Appellant.

No. A11–1732.

Court of Appeals of Minnesota.

Sept. 4, 2012.

Timothy D. Moratzka, Mychal A. Bruggeman, Mackall, Crounse & Moore, PLC, Minneapolis, MN, for respondent First National Bank.

Gregory Haupert, Rajkowski Hansmeier, Ltd., St. Cloud, MN, for respondent New Vision Coop.

Jared D. Peterson, Joshua M. Steinbrecher, Berens, Rodenberg & O'Connor, Chartered, New Ulm, MN, for appellant Wilmont–Adrian Cooperative.

Considered and decided by
BJORKMAN, Presiding Judge;
HALBROOKS, Judge; and
RODENBERG, Judge.

## OPINION

BJORKMAN, Judge.

On appeal from summary judgment, appellant Wilmont–Adrian Cooperative argues that the district court erred in holding that it has a production-inputs lien, inferior to respondent First National Bank's (FNB) security interest, and therefore cannot prevail on its Uniform Commercial Code (UCC) and conversion claims against FNB. Because we conclude that Wilmont–Adrian has a production-inputs lien under Minn.Stat. § 514.966, subd. 3, rather than a superior feeder's lien under Minn.Stat. § 514.966, subd. 4, we affirm.

## FACTS

Profit Pork, LLC is a now-defunct company that formerly engaged in the business of raising and selling hogs. FNB[1] extended a $1,300,000 line of credit to Profit Pork, protected by a security interest in Profit Pork's hog inventory, which FNB perfected on January 6, 2006. Over the next few years, FNB repeatedly increased the credit line. In return, Profit Pork provided additional security agreements. Profit Pork defaulted on the final "change in terms" agreement in March 2010.

From August 31, 2008, to June 15, 2010, Wilmont–Adrian provided feed and related services to Profit Pork. The undisputed record demonstrates that Wilmont–Adrian rolled and cracked grain to industry size; mixed the grain with materials such as corn, minerals, and antibiotics based on Profit Pork's requests; delivered the feed to Profit Pork's facilities; recorded hog performance; and recommended a stage feeding program based on hog growth. Profit Pork became indebted to Wilmont–Adrian in the amount of $587,496.21. On June 21, 2010, Wilmont–Adrian filed a UCC financing statement and a statutory-lien notice on the hogs.

FNB commenced this replevin action to foreclose on its security interest in Profit Pork's hogs. FNB then moved for pre-judgment recovery of the hogs. The district court granted the motion, permitted FNB to sell the hogs in accordance with article 9 of the UCC, Minn.Stat. §§ 336.9–101–.9–709 (2010), and directed FNB to deposit the proceeds into an escrow account pending the resolution of competing claims. FNB sold the hogs, deducted sale expenses, and deposited $514,510.10 in proceeds into an escrow account.

---

1. FNB is the only respondent who participated in this appeal.

Wilmont–Adrian answered FNB's complaint and moved for summary judgment, arguing, among other things, that (1) Wilmont–Adrian holds a feeder's lien on the hogs that is superior to FNB's security interest; (2) FNB's sale of the hogs was commercially unreasonable in violation of the UCC, Minn.Stat. § 336.9–610(b); and (3) FNB's sale of the hogs constituted a conversion of Wilmont–Adrian's lien. FNB also moved for summary judgment, asserting that (1) Wilmont–Adrian holds a production-inputs lien that is inferior to FNB's security interest; (2) FNB's lien is superior to all others, aside from respondent New Vision Coop's alleged lien; and (3) FNB is therefore entitled to an order releasing to it the portion of escrowed funds exceeding New Vision's alleged lien.

In a well-reasoned decision, the district court determined that Wilmont–Adrian has a production-inputs lien, inferior to FNB's security interest, and it therefore cannot prevail on its UCC and conversion claims. Accordingly, the district court granted summary judgment in favor of FNB and denied Wilmont–Adrian's motion. This appeal follows.

## ISSUE

Does Wilmont–Adrian have a production-inputs lien under Minn.Stat. § 514.966, subd. 3, or a feeder's lien under Minn. Stat. § 514.966, subd. 4?

## ANALYSIS

This case presents a question of statutory interpretation, which we review de novo. See ILHC of Eagan, LLC v. Cnty. of Dakota, 693 N.W.2d 412, 419 (Minn. 2005). "The primary objective of statutory interpretation is to ascertain and give effect to the intention of the legislature." Greene v. Comm'r, Minn. Dep't of Human Servs., 755 N.W.2d 713, 721 (Minn.2008). We first determine whether the statutory language is clear. See ILHC, 693 N.W.2d at 419. In doing so, we "take[ ] into account the whole structure of the statute and the context of the challenged language." In re Robledo, 611 N.W.2d 67, 69 (Minn.App.2000). If the language is clear, we must apply its plain meaning. ILHC, 693 N.W.2d at 419. If the language is ambiguous, we then "apply other canons of construction to discern the legislature's intent." Brua v. Minn. Joint Underwriting Ass'n, 778 N.W.2d 294, 300 (Minn.2010). We presume the legislature intends to effectuate all provisions of a statute, and "no word, phrase, or sentence should be deemed superfluous, void, or insignificant." Am. Family Ins. Grp. v. Schroedl, 616 N.W.2d 273, 277 (Minn.2000) (quotation omitted); see also Minn.Stat. § 645.17(2) (2010).

Minnesota law establishes special priorities for agricultural livestock liens. Minn.Stat. § 514.966 (2010). The issue here is which of the section 514.966 lien provisions applies to Wilmont–Adrian's activities. Subdivision 3 grants a production-inputs lien to a "supplier furnishing livestock production inputs in the ordinary course of business." Minn.Stat. § 514.966, subd. 3(a). "Livestock production input" is defined as "feed and labor used in raising livestock," including "commercial feeds, feed ingredients, mineral feeds, drugs, animal health products, [and] customer-formula feeds used for feeding livestock." Minn.Stat. § 514.965, subds. 6, 8 (2010). Subdivision 4 grants a feeder's lien to one who "(1) stores, cares for, or contributes to the keeping, feeding, pasturing, or other care of livestock, including medical or surgical treatment and shoeing, and (2) does so in the ordinary course of business, at the request of the owner or legal possessor of the livestock." Minn.Stat. § 514.966, subd. 4(a). A perfected feeder's lien always takes priority over a previously perfected security interest, whereas a produc-

tion-inputs lien only does so if the supplier satisfies strict notice requirements that Wilmont–Adrian did not fulfill.[2] Minn. Stat. § 514.966, subds. 3(f), 8(c), 8(f)–(i) (2010).

To determine which of the two lien provisions applies to Wilmont–Adrian, we first consider whether the statutory language is clear. Wilmont–Adrian argues that the language of the feeder's lien provision is clear and that one who simply supplies feed to another is entitled to a feeder's lien because the supplier "contributes to the ... feeding ... of livestock." The legislature did not define "contributes," but we observe that the common definition of the word is broad. *See Webster's Third New International Dictionary* 496 (1993) (defining "contribute" as to "have a share in any act or effect"). Accordingly, when viewed in isolation, the phrase, "contributes to the ... feeding ... of livestock" could extend to anyone in the feeding chain, including those who supply feed to a livestock owner.

But consideration of this one phrase does not end our plain-meaning inquiry. *See Robledo,* 611 N.W.2d at 69 (explaining that plain meaning takes account of statutory context). The production-inputs-lien provision states that a "supplier furnishing livestock production inputs" is entitled to a production-inputs lien. Minn.Stat. § 514.966, subd. 3(a). The legislature defined production inputs as "feed and labor used in raising livestock." Minn.Stat. § 514.965, subd. 6. If "contributes" in subdivision 4 is read as broadly as Wilmont–Adrian advocates, the feeder's lien provision would supplant the production-inputs-lien provision in its entirety.

Wilmont–Adrian contends that the feeder's lien provision is not ambiguous and, in fact, reflects the legislature's intent to create overlap between the two provisions, effectively giving feed suppliers a choice between a feeder's lien and a production-inputs lien.[3] We disagree. First, whenever possible, we interpret a statute to give effect to all of its provisions, deeming no provision superfluous. *Schroedl,* 616 N.W.2d at 277. What Wilmont–Adrian characterizes as overlap would, in effect, nullify the production-inputs-lien provision. Second, reading the statute to give suppliers a choice between a superior lien and an inferior lien is absurd; no supplier would choose the latter. *See id.* at 278 (explaining that courts "should construe a statute to avoid absurd results"); *see also* Minn. Stat. § 645.17(1) (2010). And third, the statute gives production-inputs liens priority over previously perfected security interests only if strict notice requirements are satisfied. Minn.Stat. § 514.966, subds.

2. A perfected production-inputs lien is superior to a previously perfected security interest if (1) the production-inputs supplier notifies the lender of the lien pursuant to Minn.Stat. § 514.966, subd. 3(b)–(c), and the lender does not respond within ten days or (2) the supplier files the lien before the lender gives value to the debtor. Minn.Stat. § 514.966, subds. 3(f), 8(f)–(i) (2010). Wilmont–Adrian's lien notice did not meet these statutory requirements.

3. Wilmont–Adrian seeks to bolster this argument by pointing to a similar overlap between veterinarian's liens and feeder's liens that ostensibly gives those who perform medical or surgical procedures on livestock a choice between liens. We are not persuaded. Veterinarian's liens only apply to those who perform "emergency veterinary services," whereas feeder's liens are available to those who perform any "medical or surgical treatment [or] shoeing" of livestock. Minn.Stat. § 514.966, subds. 1, 4(a) (2010). And veterinarian's liens only apply to licensed veterinarians, whereas feeder's liens apply to non-veterinarians who perform non-veterinary medical or surgical treatments. *Id.; see also* Minn.Stat. § 156.12, subd. 1 (2010) (excluding from the definition of veterinary medicine "the dehorning of cattle and goats or the castration of cattle, swine, goats, and sheep, or the docking of sheep").

3(b)–(f). To give feed suppliers the option of a feeder's lien, which has priority over previously perfected security interests, would contravene these notice requirements. We therefore conclude that, when read in conjunction with the production-inputs-lien provision, the phrase "contributes to the ... feeding ... of livestock" contained in the feeder's lien provision is ambiguous.

■ Because we conclude that the feeder's lien provision is ambiguous, we turn to other canons of statutory interpretation to discern the legislature's intent. In doing so, we recognize the legislature's intent to create separate and distinct liens, none of which fully encompasses the others so as to render them superfluous. *See Schroedl,* 616 N.W.2d at 277. And we look to the agricultural-livestock-lien priority scheme as a whole. *See In re R.B.P.,* 640 N.W.2d 351, 355 (Minn.App.2002), *review denied* (Minn. May 14, 2002). The legislature gives the lowest priority to suppliers, who furnish feed and labor; it gives higher priority to breeders, who contribute semen or ova to artificially impregnate livestock; and it gives yet higher priority to feeders, who "store[ ], care[ ] for, or contribute[ ] to the keeping, feeding, pasturing, or other care of livestock." Minn.Stat. § 514.966, subds. 2, 3(a), 4(a), 8. This scheme reflects the legislature's intent to give those with more direct connections to the livestock priority over those with more remote connections to the livestock. Mindful of this intent and the goal of effectuating all provisions of a statute, we read "contributes" in the feeder's lien provision to require a direct connection between the act of feeding and the livestock. And we conclude that the production-inputs lien provision applies to one who provides feed and labor to be used by another in raising livestock, whereas the feeder's lien provision applies to one who provides feed and labor directly to the livestock.

■ Having determined that the feeder's lien provision applies only to those who directly provide feed to livestock, we consider whether Wilmont–Adrian has a feeder's lien. We conclude that it does not. It is undisputed that Wilmont–Adrian did not directly feed Profit Pork's hogs. Rather, Wilmont–Adrian provided Profit Pork with feed products and information. We are not persuaded by Wilmont–Adrian's argument that the comprehensive feeder services it provided exceed those of a supplier of production inputs. The definition of a production-inputs supplier includes one who furnishes "feed *and labor,"* including "customer-formula feeds" that are "manufactured according to the specific instructions of the final purchaser." Minn.Stat. §§ 25.33, subd. 9, 514.965, subds. 6, 8 (2010) (emphasis added). Wilmont–Adrian provided nutritional advice, feed, and the necessary labor to produce custom-made feed for Profit Pork.[4] Wilmont–Adrian falls squarely within the definition of a production-inputs supplier and accordingly is entitled to a production-inputs lien.

Because Wilmont–Adrian has a production-inputs lien that is inferior to FNB's security interest, its UCC and conversion claims fail as a matter of law. To prevail on its UCC claim, Wilmont–Adrian must show that it suffered damages as a result of FNB's commercially unreasonable sale of the hogs. *Karlstad State Bank v. Fritsche,* 374 N.W.2d 177, 181 (Minn.App. 1985). To make out a conversion claim, Wilmont–Adrian must show that it had a property interest in the property converted. *Gen. Cas. Co. of Wisc. v. Mid–Continent Agencies, Inc.,* 485 N.W.2d 147, 149 (Minn.App.1992), *review denied* (Minn. July 16, 1992). Wilmont–Adrian acknowl-

---

4. Indeed, Wilmont–Adrian includes nutritional services in its feed prices, indicating that these services are incidental to its supply of feed.

edges that the fair market value of the hogs was insufficient to satisfy FNB's superior security interest. Accordingly, FNB's sale of the hogs did not damage Wilmont–Adrian as an inferior lienholder. Likewise, because Wilmont–Adrian's lien is inferior to FNB's security interest, Wilmont–Adrian has no property interest as against FNB and therefore cannot prevail on a conversion claim.

## DECISION

One who does not directly feed livestock but merely provides another with feed and information related to providing the feed to livestock is entitled to a production-inputs lien under Minn.Stat. § 514.966, subd. 3, rather than a feeder's lien under Minn.Stat. § 514.966, subd. 4. Because Wilmont–Adrian's production-inputs lien cannot sustain its claim as a matter of law, the district court did not err in granting summary judgment to FNB.

**Affirmed.**

